# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 46639

|  |  |  |
|---|---|---|
| DAVID FISK and MARGARET FISK, Husband and Wife, | ) ) | |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | |
| JEFFERY D. MCDONALD, M.D., an individual; NORTH IDAHO DAY SURGERY, LLC., dba NORTHWEST SPECIALITY HOSPITAL, | ) ) ) ) ) | Boise, April 2020 Term  Opinion Filed: October 23, 2020 |
| Defendants-Respondents, | ) ) | Melanie Gagnepain, Clerk |
| and | ) ) | |
| JOHN L. PENNINGS, M.D., an individual, | ) ) | |
| Defendant. | ) ) | |

Appeal from the District Court of the First Judicial District, State of Idaho, Kootenai County. John T. Mitchell, District Judge.

The district court's decisions are <u>affirmed</u> in part, <u>vacated</u> in part and <u>remanded</u> for further proceedings.

Gary L. Shockey, PC, Jackson, Wyoming, and Smith, Woolf, Anderson & Wilkinson, PLLC, Idaho Falls, for Appellants. Gary L. Shockey argued.

Ramsden, Marfice, Ealy & De Smet, LLP, Coeur d'Alene, for Respondent. Jeffery D. McDonald. Michael E. Ramsden argued.

Garrett Richardson, PLLC, Eagle, for Respondent North Idaho Day Surgery, LLC. Nancy Jo Garrett argued.

_____

BURDICK, Chief Justice.

This is a medical malpractice case arising out of treatment received by Margaret Fisk at North Idaho Day Surgery, LLC, d/b/a Northwest Specialty Hospital ("the Hospital"). David and

1

Margaret Fisk appeal from an order of the Kootenai County district court granting summary judgment in favor of Jeffery D. McDonald, M.D., and the Hospital. The district court granted summary judgment on the Fisks' single cause of action for medical malpractice after determining the Fisks had failed to provide expert testimony demonstrating actual knowledge of the community standard of care. The Fisks also appeal the district court's order denying their subsequent motion for reconsideration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

McDonald is a board-certified neurological surgeon who practiced medicine at the Hospital in March of 2015. The Hospital is a specialty acute-care hospital in Post Falls, Idaho.

On March 10, 2015, McDonald performed an outpatient cervical spinal fusion surgery on Mrs. Fisk at the Hospital's facility. The Hospital provided nursing care before, during, and after Mrs. Fisk's surgery. Jessica Sholtz, a nurse practitioner, assisted McDonald. Mrs. Fisk's surgery had no obvious complications.

The next day, the Hospital's nurses prepared to discharge Mrs. Fisk. However, at approximately 12:45 p.m., before she could be discharged, Mrs. Fisk began suffering abdominal pain and nausea. Shortly thereafter, the nurses administered a suppository for constipation. At about 3:00 p.m., Mrs. Fisk experienced a large emesis (vomiting), which was reported to Sholtz. At that point, Sholtz decided to postpone Mrs. Fisk's discharge from the Hospital. Mrs. Fisk's symptoms continued to worsen throughout the day and into the evening. From 7:45 p.m. to 9:00 p.m., Mrs. Fisk experienced nausea with intermittent retching emesis and severe abdominal pain. The Hospital nursing staff remained in communication with Sholtz, periodically notifying her about Mrs. Fisk's condition and receiving additional orders throughout the late evening.

During the night, at 1:26 a.m., Mrs. Fisk told nursing staff that her stomach hurt and that she felt like she was dying. Around the same time, she vomited what was described as "coffee-ground emesis" (coagulated blood in the vomit). Mrs. Fisk was still experiencing coffee-ground emesis an hour later. After Hospital nursing staff relayed information about Mrs. Fisk's condition to Sholtz, she ordered them to consult with an on-call intensivist. After consultation, the intensivist recommended Mrs. Fisk be transferred to Kootenai Medical Center for a gastrointestinal consult and a possible endoscopy.

The Hospital's nursing staff communicated the intensivist's recommendation to Sholtz, who directed them not to transfer Mrs. Fisk and to prepare her for a possible "scope" later that

morning. Throughout the next several hours, Mrs. Fisk described her abdominal pain as "a ten-out-of-ten."

At 6:00 a.m., Sholtz returned to the Hospital "to round on" Mrs. Fisk. Around 6:45 a.m., Sholtz was attempting to coordinate a gastrointestinal consult. An hour later, around 7:45 a.m., the nursing staff noted that Mrs. Fisk's pain remained at a ten-out-of-ten, her bowels were not making any sounds, and her abdomen was firm and distended. About the same time, John L. Pennings, M.D., arrived at the Hospital for the gastrointestinal consult. Pennings believed Mrs. Fisk was in "terminal phase shock" and ordered that she be prepared for surgery. After performing an exploratory laparotomy, Pennings discovered that Mrs. Fisk had developed mesenteric artery ischemia, which is "a loss of blood supply to the small intestines [sic] leading to end-organ loss." This required Pennings to remove a significant amount of Mrs. Fisk's small intestine to save her life. Because Mrs. Fisk's colon also suffered from a loss of blood supply, Pennings performed a "total abdominal colectomy with an end ileostomy" (removal of the large intestine and part of the small intestine). At about 12:18 p.m., after the surgery, Mrs. Fisk was in critical condition and transferred to the Intensive Care Unit at Kootenai Medical Center, where she received treatment and eventually recovered, but with serious ongoing repercussions.

The Fisks filed their Complaint against Pennings, McDonald, and the Hospital on March 1, 2017, alleging each defendant was negligent in their medical treatment of Mrs. Fisk. Each defendant filed separate answers to the Complaint, generally denying liability. Pursuant to a stipulation of the parties, the district court entered an order dismissing the Fisks' claims against Pennings on January 26, 2018.

Pursuant to the district court's scheduling order, the Fisks disclosed thirteen non-retained experts and six retained expert witnesses. On April 3, 2018, shortly after filing its own expert witness disclosures, the Hospital filed a motion to strike the Fisks' expert witness disclosures and to exclude the Fisks' retained experts. Along with its motion to strike and exclude experts, the Hospital filed a motion for summary judgment. The Hospital's primary arguments in favor of summary judgment were (1) that the Fisks failed to provide admissible evidence of the applicable standard of care or breach of the applicable standard of care; and (2) that the Fisks failed to present admissible evidence to establish proximate cause. On April 24, 2018, McDonald filed a similar motion for summary judgment.

The Fisks responded to both motions for summary judgment on May 9, 2018. In support, the Fisks submitted the declarations of four expert witnesses: Suzanne Nebeker, BSA, RN, BSN,

3

MSN, FNB-BC; Vernon R. Kubiak, DNP, CNP, CNS, CNS-BC, PMHNP-BC, RN; Timothy F. Hawkins, FACHE CHSP; and Robert Y. Uyeda, MD. On May 23, 2018, the district court held a hearing on both motions for summary judgment and the Hospital's motion to strike and exclude the Fisks' experts.

On May 31, 2018, the district court entered a memorandum decision and order addressing all the motions. At the outset, the district court denied the Hospital's motion to strike with respect to all but one of the Fisks' disclosed experts, holding that the Fisks were not required to disclose the foundation for their experts' community standard of care testimony as part of their disclosures.[1] The court granted both McDonald's and the Hospital's motions for summary judgment, explaining that none of the four expert declarations submitted by the Fisks in opposition to summary judgment demonstrated that any of the four expert witnesses had "actual knowledge" of the community standard of care applicable to McDonald or the Hospital. Specific to the Fisks' claim against McDonald, the district court explained that the Fisks had not "adequately pled" that McDonald was vicariously liable for Sholtz's acts and omissions under a theory of "express authority, implied authority, or apparent authority." Finally, the district court rejected an argument made by the Fisks that the burden of proof on summary judgment never shifted to them because McDonald and the Hospital had failed to state what the applicable community standard of care was.

The Fisks filed a motion to amend their complaint on June 7, 2018, to add a claim that McDonald was liable for the acts and omissions of Sholtz. The district court entered judgments dismissing the Fisks' claims against the Hospital and McDonald with prejudice on June 7, 2018, and June 8, 2018, respectively. The Fisks subsequently filed two motions for reconsideration, one corresponding to each judgment. In support of their motions for reconsideration, the Fisks provided additional declarations from Vernon R. Kubiak, Suzanne Nebeker, and Timothy Hawkins.

The district court held a hearing on the Fisks' motions on October 10, 2018. At the hearing, counsel for the Fisks communicated his inability to procure local experts to testify as to the community standard of care, describing it as "virtually impossible in smaller communities in Idaho." After the hearing, the district court denied the Fisks' motion to amend and the motions for reconsideration. On December 3, 2018, the district court entered an amended judgment with

---

[1] The expert witness disclosure that was struck was that of David M. Smith, CPA, who was not one of the experts the Fisks relied on to prove the local standard of care.

4

respect to each defendant, dismissing the Fisks' claims against McDonald and the Hospital with prejudice. The Fisks timely appealed.

## II.  ISSUES ON APPEAL

1. Did the district court err in granting McDonald's and the Hospital's motions for summary judgment on the grounds that the Fisks failed to provide sufficient expert testimony as to the community standard of care?

2. Did the district court err by holding that the burden was on the Fisks to establish the essential elements of their case on summary judgment?

3. Did the district court err in denying the Fisks' motions for reconsideration?

4. Did the district court err in holding that the Fisks failed to properly plead that McDonald is liable for the acts or omissions of Sholtz under an agency theory of liability?

## III.  STANDARD OF REVIEW

"On appeal from the grant of a motion for summary judgment, this Court utilizes the same standard of review used by the district court originally ruling on the motion." *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 472, 337 P.3d 627, 631 (2014) (quoting *Arregui v. Gallegos-Main*, 153 Idaho 801, 804, 291 P.3d 1000, 1003 (2012)). Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). When considering "whether the evidence shows a genuine issue of material fact, the trial court must liberally construe the facts, and draw all reasonable inferences in favor of the nonmoving party." *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (citation omitted).

"The admissibility of expert testimony, however, is a threshold matter that is distinct from whether the testimony raises genuine issues of material fact sufficient to preclude summary judgment." *Arregui*, 153 Idaho at 804, 291 P.3d at 1003 (citing *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 163, 45 P.3d 816, 819 (2002)). On the threshold issue of admissibility, "the liberal construction and reasonable inferences standard does not apply . . . ." *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (citing *Dulaney*, 137 Idaho at 163, 45 P.3d at 819). Instead, "the trial court must look at the witness' affidavit or deposition testimony and determine whether it alleges facts which, if taken as true, would render the testimony of that witness admissible." *Id.*

We will not disturb evidentiary rulings of the district court "unless there has been a clear abuse of discretion." *Navo v. Bingham Mem'l Hosp.*, 160 Idaho 363, 369–70, 373 P.3d 681, 687–88 (2016) (quoting *Mattox*, 157 Idaho at 473, 337 P.3d at 632). We review a district court's discretionary decisions under the four-part standard set out in *Lunneborg v. My Fun Life*, 163

Idaho 856, 421 P.3d 187 (2018). Under the *Lunneborg* standard, we ask whether the district court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Id.* at 863, 421 P.3d at 194 (citation omitted).

## IV.   ANALYSIS

**A. The district court did not err in granting McDonald's and the Hospital's motions for summary judgment on the grounds that the Fisks failed to provide sufficient expert testimony as to the community standard of care.**

The district court granted McDonald's and the Hospital's motions for summary judgment on the grounds that the Fisks failed to present admissible evidence on the applicable community standard of care—an essential element of their medical malpractice claim.

Under Idaho Code section 6-1012, a plaintiff bringing a medical malpractice claim must provide expert testimony establishing that the defendant healthcare provider(s) did not meet the applicable standard of healthcare practice. With regard to the applicable standard of care, section 6-1012 provides in relevant part that:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including . . . any . . . nurse practitioner, registered nurse, . . . hospital, . . . or any person vicariously liable for the negligence of them . . . such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence . . . with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning.

I.C. § 6-1012.

An expert witness may testify as to the applicable community standard of care only if he or she has actual knowledge of the community standard as it existed "at the time and place of the alleged negligence." *Navo v. Bingham Mem'l Hosp.*, 160 Idaho 363, 370, 373 P.3d 681, 688 (2016) (citing I.C. § 6-1013). Idaho Code section 6-1013 governs the manner in which proof of the community standard of healthcare practice may be provided:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid,

6

establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with *actual knowledge of the applicable said community standard* to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and thereafter giving opinion testimony in such a trial.

I.C. § 6-1013 (emphasis added).

As dictated by the statute, a plaintiff in a medical malpractice case must establish the applicable community standard of care by way of expert testimony. *Id.* A plaintiff who is unable to find a local expert willing to testify as to the community standard of care is not necessarily prevented from bringing his or her claim. A plaintiff can also establish the standard of care through the testimony of an out-of-area expert. *See* I.C. § 6-1013. However, before an out-of-area expert can testify as to the standard of care, the expert must show that he or she is familiar with the applicable standard in the community in which the defendant practices. *Dulaney v. St. Alphonsus Reg'l Med. Ctr.*, 137 Idaho 160, 164, 45 P.3d 816, 820 (2002) (citations omitted). Furthermore, the out-of-area expert must explain *how* he or she became familiar with that standard of care in that community. *Id.*

In determining whether an expert witness has actual knowledge of the applicable community standard of care, "[t]he guiding question is simply whether the affidavit alleges facts which, taken as true, show the proposed expert has actual knowledge of the applicable standard of care." *Mattox v. Life Care Ctrs. of Am., Inc.*, 157 Idaho 468, 474, 337 P.3d 627, 633 (2014). To address this question, "courts must look to the standard of care at issue, the proposed expert's grounds for claiming knowledge of that standard, and determine—employing a measure of common sense—whether those grounds would likely give rise to knowledge of that standard." *Id.* Demonstrating that an expert has actual knowledge of the community standard of care "is not intended to be an 'overly burdensome requirement.'" *Id.* (quoting *Frank v. E. Shoshone Hosp.*, 114 Idaho 480, 482, 757 P.2d 1199, 1201 (1988)). "Nor is the standard static and firmly rooted in past medical practices." *Id.* Rather, "[s]tandards of care are sensitive to evolving changes in the way health care services are delivered in the various communities of our State." *Id.*

Here, all four expert witnesses relied upon by the Fisks to prove the applicable community standard of care are out-of-area experts. The district court determined that none of

7

the experts had demonstrated actual knowledge of the community standard of care in their declarations. We review each determination in turn.

1. <u>The district court did not abuse its discretion in determining the declaration of Vernon R. Kubiak was inadmissible on summary judgment for lack of actual knowledge of the applicable community standard of care.</u>

The Fisks retained Vernon R. Kubiak to provide an expert opinion as to the community standard of care applicable to nurses. Kubiak works in Pocatello, Idaho, as a nurse practitioner at the Mental Wellness Center and as a professor at Idaho State University. As an out-of-area expert, Kubiak claimed in his declaration that the community standard of care for nurses in the Post Falls/Coeur d'Alene area in March of 2015 was the same as a national standard—the American Nurses Association (ANA) Standards of Practice. In support of this opinion, Kubiak relied on the Hospital's internal standard procedures. Kubiak further indicated that he relied on the "State Nurse Practices Act," the "Joint Commission recommendations" for accredited facilities, the "Hospital's policies and procedures," and "authoritative nursing texts and journals." Finally, Kubiak reviewed the depositions of Jessica Sholtz, NP, and three registered nurses employed by the Hospital. Because Kubiak claimed that the Hospital's policies and procedures adopted the ANA Standards of Practice as the applicable standard of care, he explained that there was "no need" for him to actually speak to a registered nurse or an expert from the Post Falls/Coeur d'Alene area.

The district court determined that although Kubiak had reviewed the depositions of Jessica Sholtz, NP, and the three registered nurses, he "[did] not link his review of those depositions to his understanding of the local standard of care." Therefore, the district court reasoned, Kubiak did not rely upon any deposition testimony to determine whether the community standard of care was the same as a national standard. Having determined that Kubiak relied completely on the Hospital's internal policy statements in an attempt to familiarize himself with the community standard of care, and further explaining that this Court's precedent requires either consultation with a local expert or review of deposition testimony to establish that the community standard of care was the same as a national standard, the district court concluded that Kubiak had failed to demonstrate that the community standard of care for nurses in the Post Falls/Coeur d'Alene area was the same as a national standard. As such, the district court reasoned that Kubiak's familiarity with the national standard was insufficient to demonstrate actual knowledge of the community standard of care.

8

On appeal, the Fisks argue that a hospital's internal policies adopting national standards of practice are by themselves enough to demonstrate that the community standard of care was the same as a national standard. In support of their position, they cite to *Mattox v. Life Care Centers of America, Inc.*, 157 Idaho 468, 337 P.3d 627 (2014), and *Suhadolnik v. Pressman*, 151 Idaho 110, 254 P.3d 11 (2011). However, neither *Mattox* nor *Suhadolnik* supports the Fisks' position. In *Mattox*, the plaintiff's expert personally interviewed two local practitioners and relied on a patient-specific care plan that had been developed by the plaintiff's primary care provider to demonstrate actual knowledge of the community standard of care. 157 Idaho at 478–79, 337 P.3d at 637–38. The expert's consultation with two local practitioners in *Mattox* makes that case immediately distinguishable from the case at hand because Kubiak did not consult any local practitioners. In *Suhadolnik*, the plaintiff's expert attempted to rely upon the plaintiff's medical records in addition to the defendant's deposition to familiarize himself with the community standard of care. 151 Idaho at 118, 254 P.3d at 19. However, because the defendant stated in his deposition that he did not know the standard of care and did not testify that the community standard was the same as the national standard, we reasoned that it was insufficient to provide foundation for the plaintiff's expert's opinion as to the standard of care. *Id.* at 119–20, 254 P.3d at 20–21. In sum, neither case cited by the Fisks supports their argument that an out-of-area expert can rely on a hospital's internal policies alone to demonstrate that the community standard of care was the same as a national standard.

In fact, we have never held that a hospital's internal policies, standing alone, were sufficient to allow an expert to ensure that the community standard of care does not deviate from the national standard. Nor are we prepared to do so based on the internal policies discussed in Kubiak's declaration. Kubiak pointed to the following Hospital policy statement to support his conclusion that the ANA standards were the community standard of care: "It is the policy of the hospital to utilize the American Nurses Association's standards of practice based on the nursing process." This policy statement, he claims, "makes the American Nurses Association's standards of practice applicable to all nursing actions at the facility." It is not immediately clear from this policy statement that the ANA standards were the community standard of care in the Post Falls/Coeur d'Alene area. It could be that the Hospital only intended to supplement the community standard of care with the ANA's standards of practice. Or the Hospital may have the policy statement as a form of aspirational goal for its nurses. Without the further detail ultimately provided in Kubiak's second declaration and discussed in Section C of this opinion, it is unclear

9

that the ANA standards had become the community standard of care. That is not to say that the Hospital's policy statement cannot help inform Kubiak's understanding of the community standard of care, but it does not provide enough on its own to determine whether the ANA standards were the community standard of care.

Notwithstanding the district court's conclusion that Kubiak relied solely upon the Hospital's internal policy statements to determine that the ANA standards of practice were the community standard of care, and notwithstanding the Fisks' argument on appeal that the Hospital's policy statements were sufficient on their own, we note that Kubiak's first declaration indicates that he did in fact review the depositions of nurse practitioner Sholtz and three of the hospital's nurses. And we disagree with the district court's characterization of those depositions as not having been relied upon by Kubiak. In coming to that conclusion, the district court pointed out that Kubiak's declaration did not specifically "link" the fact that he reviewed the depositions to his knowledge of the standard of care. We agree that Kubiak did not do so, at least in the sense that he did not mechanically state that the depositions caused him to understand that the community standard of care was the same as a national standard of care. However, such a specific "link" between an expert's testimony regarding the standard of care and the foundation upon which it relies is not necessary. It is enough that Kubiak explained in his declaration that his opinions as to the standard of care were based upon his review of the records, discussions, interviews, and other relevant documents that were provided to him and indicated that the depositions of nurse practitioner Sholtz and the three Hospital nurses were among the documents which he reviewed.

This conclusion is supported by a number of our more recent cases explaining that "no 'magic language' is required to demonstrate the requisite familiarity with the applicable standard of health care practice . . . ." *Samples v. Hansen*, 161 Idaho 179, 183, 384 P.3d 943, 947 (2016); *see also Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 747, 463 P.3d 365, 381 (2020); *Mattox*, 157 Idaho at 473–74, 337 P.3d at 632–33 ("This Court does not require that an affidavit include particular phrases or state that the expert acquainted himself or herself with the applicable standard of care in some formulaic manner in order to establish adequate foundation under Section 6-1013.") (citations omitted). Rather, "[t]he guiding question is simply whether the affidavit alleges facts which, taken as true, show the proposed expert has actual knowledge of the applicable standard of care." *Mattox*, 157 Idaho at 474, 337 P.3d at 633. To require an expert to include specific language "linking" the sources he reviewed to his understanding of the

10

standard of care is to demand the "magic language" we have said is not required. Explaining that a source was reviewed by the expert and that all of the sources reviewed helped to inform the expert's understanding of the standard of care is enough for a district court to come to the limited conclusion that the expert relied upon that source in forming his opinion on the standard of care.

Rather than getting hung up on whether an expert has mechanically stated that he relied upon a source, the key question is the quality of the sources reviewed by the expert, and whether they contain sufficient facts which, if taken as true, can support the expert's claim that he has familiarized himself with the community standard of care.

Reviewing the depositions of local healthcare providers is one way an out-of-area expert can determine that the community standard of care is the same as a national standard. *Phillips*, 166 Idaho at 748, 463 P.3d at 382. Here, having concluded that Kubiak reviewed four depositions in addition to the Hospital's internal policies in forming his opinion that the ANA standards were the same as the community standard of care, we would ordinarily turn to those depositions, or Kubiak's statements about their contents, to determine whether they contain sufficient facts to demonstrate that the community standard of care does not deviate from the national standard of care. *See, e.g.*, *Kozlowski v. Rush*, 121 Idaho 825, 830, 828 P.2d 854, 859 (1991) (concluding that an out-of-area expert's testimony was supported by sufficient foundation when the expert testified that he was familiar with a national standard of care and had reviewed the deposition of a doctor who practiced in the same area as the defendant which stated that the community standard was the same as the national standard "with one irrelevant exception"). However, we are unable to review the depositions in this case because none of them, with the exception of four irrelevant pages of Sholtz's deposition, appear anywhere in the record. Furthermore, Kubiak, in his first declaration, does not quote from or otherwise explain the content of those depositions in any detail. Therefore, although we conclude that Kubiak did in fact rely upon the depositions in forming his understanding of the community standard of care, we cannot, based upon Kubiak's first declaration, conclude that the depositions contained sufficient facts to demonstrate that the community standard of care deviates from the ANA standards identified by Kubiak. As such, we must conclude that Kubiak's familiarity with the ANA standards is not enough to demonstrate actual knowledge of the community standard of

11

care, because his first declaration[2] fails to show that the ANA standards were the community standard of care. Thus, the district court did not abuse its discretion in determining that Kubiak's declaration was inadmissible at the summary judgment stage.

2. <u>The district court did not abuse its discretion in determining the declaration of Dr. Robert Y. Uyeda was inadmissible on summary judgment for lack of actual knowledge of the applicable community standard of care.</u>

The Fisks retained Dr. Robert Y. Uyeda primarily to provide an expert opinion as to the element of causation. However, the Fisks also intended for Uyeda to testify as to the applicable community standard of care. Uyeda is a physician and surgeon with an active general surgery practice in Los Angeles County, California. As an out-of-area expert, Uyeda claimed in his declaration that he familiarized himself with the community standard of care by consulting with Mrs. Fisk's primary care physician, Dr. Scott Dunn, who is a physician local to the Post Falls/Coeur d'Alene area. Based upon his consultation with Dunn, Uyeda believed his medical opinions were consistent with the community standards of care in the Post Falls/Coeur d'Alene area, particularly in relation to "the need for nurse practitioner Sholtz to have personally examined M[r]s. Fisk in the evening of March 11, 2015, and the need to involve a medical doctor in the care and assessment much earlier than the engagement of the interventionist in the early morning hours of March 12[, 2015]."

The district court concluded that Uyeda's consultation with Mrs. Fisk's primary-care physician was insufficient to demonstrate actual knowledge of the community standard of care because Uyeda's declaration did not show that the primary-care physician had actual knowledge of the standard of care for nurses in the Post Falls/Coeur d'Alene area in March of 2015.

"One method for an out-of-area expert to obtain knowledge of the local standard of care is by inquiring of a local specialist." *Dulaney*, 137 Idaho at 164, 45 P.3d at 820 (citing *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 995 P.2d 816 (2000)). "[W]hen consulting with a local specialist, that specialist need not have practiced in the same field as the defendant, so long as the consulting specialist is sufficiently familiar with the defendant's specialty." *Suhadolnik*, 151 Idaho at 116, 254 P.3d at 17 (citing *Newberry v. Martens*, 142 Idaho 284, 292, 127 P.3d 187, 195 (2005)). The out-of-area expert's declaration must also "provide adequate reason to believe that the local specialist interviewed has actual knowledge of the applicable standard of care."

---

[2] Kubiak's first declaration was his only declaration at the time the district court decided the defendants' motions for summary judgment.

*Mattox*, 157 Idaho at 476, 337 P.3d at 635 (quoting *Dulaney*, 137 Idaho at 166–67, 45 P.3d at 822–23).

In *Dulaney v. St. Alphonsus Regional Medical Center*, this Court held that an out-of-area expert's affidavit lacked foundation when it did not contain facts demonstrating that the local specialist who was consulted had actual knowledge of the applicable standard of care. 137 Idaho at 166–67, 45 P.3d at 822–23. There, the out-of-area expert was an emergency-room physician who had been retained to testify about the community standard of care applicable in emergency-room settings in Boise, Idaho. *Id.* at 164–65, 45 P.3d at 820–21. In his affidavit, the out-of-area expert stated that he familiarized himself with the community standard of care by consulting a physician who practiced internal medicine at the Boise VA Medical Center. *Id.* at 165–66, 45 P.3d at 821–22. The out-of-area expert further explained in his affidavit that the local physician had "confirmed that there were no deviations between the standard of care applicable to emergency room physicians in Boise, Idaho . . . treating a patient with [plaintiff's] symptoms . . . and the standard of care applicable to emergency room physicians practicing in Seattle, Washington treating similar patients . . . ." *Id.* at 166, 45 P.3d at 822.

Affirming the district court's decision striking the out-of-area expert's testimony as to the standard of care, this Court emphasized that the out-of-area expert's affidavit did not contain any facts demonstrating that the local physician had actual knowledge of the community standard of care applicable to *emergency-room* physicians in Boise at the relevant time. *Id.* at 166–67, 45 P.3d at 822–23. Therefore, the out-of-area expert's consultation with the local physician was not sufficient to familiarize him with the community standard of care because the local physician did not have actual knowledge of the specific community standard. *Id.*

Here, there are no facts suggesting that Dunn, a primary-care *physician* in Post Falls, is familiar with the standard of care applicable to *nurses* working in a hospital in the Post Falls/Coeur d'Alene area. That is not to say that Dunn could not have familiarized himself with the standard of care applicable to nurses and subsequently shared that information with the Fisks' expert. He most certainly could have. *See Newberry v. Martens*, 142 Idaho 284, 292, 127 P.3d 187, 195 (2005) (citation omitted) ("[I]t is unnecessary for an expert witness to be of the same specialty as the defendant so long as the expert establishes he possesses actual knowledge of the standard of care to be applied."). However, Uyeda's declaration did not establish that Dunn did so in this case. Much like the expert in *Dulaney*, who could not rely on a consultation with a local physician who practiced internal medicine when there were no facts demonstrating that the

13

local physician had actual knowledge of the standard that applied to emergency-room physicians, here, Uyeda's declaration is insufficient where it contains no facts demonstrating that the primary-care physician had actual knowledge of the specific standard of care for *nurses*. As a result, the district court correctly determined that Uyeda had not familiarized himself with the applicable community standard. Accordingly, the district court did not abuse its discretion in concluding that Uyeda's declaration was inadmissible on summary judgment.

3. The district court did not abuse its discretion in determining the declaration of Timothy F. Hawkins was inadmissible on summary judgment for lack of actual knowledge of the applicable community standard of care.

The Fisks retained Timothy F. Hawkins to testify, in part, regarding the community standard of care for the administration of a hospital. Hawkins resides in Cape Coral, Florida. He works as a part-time hospital administration consultant and as the Living Hope Haiti Surgical Team coordinator, surgical tech, and director of field engineering. As an out-of-area expert, Hawkins claimed in his declaration that the community standard of care for hospital administration in the Post Falls/Coeur d'Alene area in March of 2015 were the same as two national standards—the Joint Commission Standards and the "CMS" Conditions of Participation. In making this determination, Hawkins relied upon his consultation with Dennis Kelly, who works in the "non-long term care division" of the Idaho Department of Health and Welfare. Hawkins confirmed with Kelly that the Hospital is a "CMS facility" and is therefore subject to all CMS standards and guidelines such as the CMS Conditions of Participation. Hawkins also stated that he reviewed the Hospital's "Medical Staff By-Laws." Finally, Hawkins claimed that the Hospital is subject to the Joint Commission Standards because it holds itself out as "accredited by the Joint Commission."

The district court concluded that there was no foundation for Hawkins's opinions regarding the applicable community standard of care because the Joint Commission standards he relied upon in his declaration could not be the community standard of care.

Federal or statewide regulations that establish a standard of care can be the community standard of care. *See Navo*, 160 Idaho at 371–72, 373 P.3d at 689–90. However, "not all state or federal regulations are the type that can replace a local standard of care." *Id.* at 372, 373 P.3d at 690. As a consequence, a national standard of care does not automatically become the community standard "simply because the federal government has created some general regulatory scheme for a given area of medicine." *Id.* Rather, "[t]here is a marked difference

14

between regulations that govern *the physical administration of health care services to patients* and those that govern other aspects of a health care provider's practice, such as organizational, personnel, and utilization requirements." *Id.* (emphasis added) (quoting *McDaniel v. Inland Nw. Renal Care Group-Idaho, LLC*, 144 Idaho 219, 223, 159 P.3d 856, 860 (2007)). "Only regulations that concern the 'physical administration of health services' can replace a local standard of care for purposes of Idaho Code sections 6-1012 and 6-1013." *Id.* (quoting *Mattox*, 157 Idaho at 478, 337 P.3d at 637). To become the community standard of care, "th[e] regulation *must provide actual concrete guidance with respect to the activities it purports to govern.*" *Id.* at 373, 373 P.3d at 691 (emphasis added).

We have previously reviewed several Joint Commission Standards and found them lacking the "actual concrete guidance" required to supplant a community standard of care. *Id.* at 371–74, 373 P.3d at 689–92. For example, in *Navo v. Bingham Memorial Hospital*, we addressed the following Joint Commission Standards:

> LD.1.10—"The hospital identifies how it is governed. The hospital has governance with ultimate responsibility and legal authority for the safety and quality of care, treatment, and services."
>
> LD.1.30—"The hospital complies with applicable law and regulation."
>
> LD.2.20—"Each hospital program, service, site or departments has effective leadership."
>
> LD.3.50—"Care, treatment, and services provided through contractual agreement are provided safely and effectively."

160 Idaho at 373, 373 P.3d at 691. These standards were "not sufficient to replace a local standard of care" because rather than "provid[ing] a coherent standard of care that a hospital could look to for guidance in the administration of anesthesia services," the Standards were mere "[g]eneralities requiring 'compliance with the law,' 'effective leadership,' and that services be provided 'safely' and 'effectively[.]'" *Id.*

Here, Hawkins's declaration claimed the Hospital fell below the standard of care purportedly contained within the following three Joint Commission Standards:

> NR.02.03.01—"The nurse executive directs the implementation of nursing policies and procedures, nursing standards and nurse staffing plans."
>
> LD.04.03.07—"Patients with comparable needs receive the same standard of care, treatment and services throughout the hospital."
>
> PC.02.01.19—"The hospital recognizes and responds to changes in patient condition."

15

We agree with the district court that these Joint Commission Standards are mere administrative generalities and not a substitute for the community standard of care at issue in this case.

Joint Commission Standard NR.02.03.01 is directed at "organizational" or "personnel" matters, not "the physical administration of healthcare services to patients." While Hawkins argues that it shows that the nurse executive sits atop the "nursing chain of command," this argument collapses under its own weight. Standard NR.02.03.01 provides no details about the policies or procedures a nurse or nurse practitioner must follow when a post-op patient presents with severe abdominal distress. It only explains how the Hospital organizes its workforce of nurses.

Similarly, Joint Commission Standard LD.04.03.07 fails to provide a substitute for the community standard of care for the same reason. As Hawkins explains in his declaration, Standard LD.04.03.07 governs the availability of treatment and services to ensure that one patient is not provided less access to the hospital's treatment and services based on different payment sources, variances in staff, or different settings. Although it provides that all patients should receive the same standard of care, it does not delineate a specific standard that concerns the actual "physical administration of healthcare to patients" or provide "actual concrete guidance" on such activities.

Finally, Joint Commission Standard PC.02.01.19, though discussing treatment of individual patients, also lacks the "actual concrete guidance" required to replace the community standard of care. The standard is silent on how to recognize changes in patient condition and fails to provide specific concrete guidance on how to respond to such changes.

In sum, none of the Joint Commission Standards relied upon by Hawkins in his declaration provide "actual concrete guidance" concerning "the physical administration of health care to patients" sufficient to replace the community standard of care. *See Navo*, 160 Idaho at 372–73, 373 P.3d at 690–91. As a consequence, Hawkins familiarity with the Joint Commission Standards is insufficient to show "actual knowledge" of the community standard of care because those standards were not specific enough to supersede the community standards. Accordingly, the district court did not abuse its discretion in concluding that Hawkins's declaration was inadmissible on summary judgment because it lacked the requisite foundation.

4. <u>The district court did not abuse its discretion in determining the declaration of Suzanne Nebeker was inadmissible on summary judgment for lack of actual knowledge of the applicable community standard of care.</u>

The Fisks retained Suzanne Nebeker to, among other things, testify about the applicable community standard of care for nurses and nurse practitioners. Nebeker is a nurse practitioner in Salmon, Idaho. As an out-of-area expert, Nebeker claims to have familiarized herself with the community standard of care for nurses and nurse practitioners in the Post Falls/Coeur d'Alene area by reviewing Kubiak's report (attached to his first declaration), the Hospital's internal policies, several Idaho regulations, and a number of secondary sources, such as textbooks, scholarly articles, and professional manuals. Nebeker concluded that the community standard of care in the Post Falls/Coeur d'Alene area in March of 2015 was the same as a statewide standard of care.[3]

The district court concluded that, like Kubiak, Nebeker's declaration failed to show that a statewide standard was the community standard for nursing care in the Post Falls/Coeur d'Alene area in March of 2015.

Among the defects in Nebeker's declaration is that she failed to explain how the secondary sources she relied upon in forming her opinion demonstrate that the community standard of care was the same as a statewide standard. While the extensive list of secondary sources cited in her declaration might have informed her opinion as to the applicable standard of care, nothing in her declaration explains what that standard of care was, or how she determined that it was the community standard in the Post Falls/Coeur d'Alene area. Nebeker's reliance on the Hospital's internal policies fails for the same reasons. Even if those policies helped her form the opinions in her declaration, her declaration failed to explain how she determined that the applicable community standard of care was the same as a statewide standard of care.

Nebeker's reliance on the report attached to Kubiak's first declaration is also insufficient to provide her with actual knowledge of the community standard of care. As previously explained in Section A(1), Kubiak failed to demonstrate in his first declaration that he had actual knowledge of the community standard of care. Therefore, it stands to reason that Nebeker cannot show actual knowledge of the community standard of care by reviewing the report or declaration of an out-of-area expert determined to lack actual knowledge of the community standard. Put differently, Nebeker cannot rely upon an expert report to familiarize herself with the community

---

[3] It is not entirely clear from Nebeker's first declaration what she believed the local standard of care to be. However, because she ultimately opined that the Hospital and nurse practitioner Sholtz fell short of state regulations and nursing guidelines, it appears that she believed the local standard of care was the same as a statewide standard.

standard of care when the expert who authored the report had no familiarity with the community standard of care to begin with.

Finally, Nebeker's reliance on the Board of Nursing regulations fails to provide her with "actual knowledge" of the community standard of care because none of the regulations govern the "physical administration of health services." Nebeker asserted that as a licensed nurse practitioner, Sholtz was required to comply with state regulations promulgated by the Board of Nursing. Specifically, Nebeker cites to Idaho Administrative Code: IDAPA 23.01.01.280.01, – 280.02(a)–(c), (e), (g), and –280.05.[4]

An expert may prove actual knowledge of the community standard of care by demonstrating familiarity with a statewide standard of care that is the standard within the applicable community. *Navo*, 160 Idaho at 371–72, 373 P.3d at 689–90. In order for State regulations to be the community standard of care, they must "concern the physical administration of health services." *Id.* at 372, 373 P.3d at 690. The statewide regulation must also provide "actual concrete guidance with respect to the activities it purports to govern." *Id.* at 373, 373 P.3d at 691.

In this case, none of the IDAPA provisions relied upon by Nebeker govern the actual physical administration of healthcare services. For example, IDAPA 23.01.01.280.01 provides as follows:

> **01. Purpose.**
>
> **a.** To establish standards essential for safe practice by the advanced practice registered nurse; and
>
> **b.** To serve as a guide for evaluation of advanced practice registered nursing to determine if it is safe and effective.

This provision is a broad purpose statement and, as such, does not provide "concrete guidance" as to "the physical administration of health services to a patient."

Nebeker's reliance on IDAPA 23.01.01.280.02 is also misplaced. That rule, at the time Nebeker relied upon it, provided in relevant part:

> **02. Core Standards for All Categories of Advanced Practice Professional Nursing.** The advanced practice professional nurse shall practice in a manner

---

[4] Though the district court determined that Nebeker also relied upon IDAPA 23.01.01.400.01 and –400.02, careful review of Nebeker's declaration indicates that she did not rely on those sections. Sections 400.01 and 400.02 are cross-referenced in the language of IDAPA 23.01.01.280.02(c). Nebeker quoted section 280.02(c) in full in her declaration. As such, sections 400.01 and 400.02 appear in her declaration as part of that quoted language. Nebeker did not include the language of sections 400.01 or 400.02 in her declaration, nor did she refer to them in discussing the standard of care.

consistent with the definition of advanced practice professional nursing and the standards set forth in these rules. The advanced practice professional nurse may provide client services for which the advanced practice professional nurse is educationally prepared and for which competence has been attained and maintained.

**a.** The advanced practice professional nurse shall consult and collaborate with other members of the health care team.

**b.** The advanced practice professional nurse shall recognize his limits of knowledge and experience and shall consult and collaborate with and refer to other health care professionals as appropriate.

**c.** The advanced practice professional nurse shall retain professional accountability for advanced practice professional nursing care according to the advanced practice professional nurse's scope of practice and Subsections 400.01 and 400.02 of these Rules.

. . .

**e.** The advanced practice professional nurse shall assess clients, identify problems or conditions, establish diagnoses, develop and implement treatment plans and evaluate patient outcomes.

. . .

**g.** The advanced practice professional nurse shall use critical thinking and independent decision-making, commensurate with the autonomy, authority and responsibility of the practice category . . . .

By their plain terms, none of these sections govern the "physical administration of health care to patients." Sections (a)–(c) provide broad standards and competency requirements, but say nothing of patient treatment. Section (e), on the other hand, discusses "clients," but it merely describes in broad terms the tasks an advanced practice professional nurse will seek to accomplish. It does not explain how nurses are to accomplish these tasks, nor does it provide a specific standard of care to be applied in accomplishing them. Section (g) is a broad statement regarding the competency of advanced practice professional nurses, it does not speak to the physical administration of health care to patients. Thus, section 280.02 merely provides general statements about what advanced practice professional nurses do and the competencies they must maintain. It does not specifically govern the physical administration of healthcare to a patient.

Next, at the time it was relied upon by Nebeker, IDAPA 23.01.01.280.05 provided:

**05. Nurse Practitioner.** In addition to the core standards, advanced practice professional nurses in the category of nurse practitioner shall practice in accord with standards established by the American Nurses Credentialing Center, the American Academy of Nurse Practitioners, the National Association of Pediatric Nurse Associates and Practitioners or the Association of Women's Health

19

> Obstetrics and Neonatal Nurses. Nurse practitioners who meet qualifying requirements and are licensed by the board may perform comprehensive health assessments, diagnosis, health promotion and the direct management of acute and chronic illness and disease as defined by the nurse practitioner's scope of practice. The scope of practice of an authorized nurse practitioner may include the prescribing and dispensing of pharmacologic and non-pharmacologic agents.

This section adopts national standards for advanced practice professional nurses in the category of nurse practitioners and delineates the scope of practice such nurses may engage in if they meet certain qualifications. Like the previous provisions, it does not mention patients or provide any concrete standard governing the physical administration of healthcare services.

Because none of the IDAPA provisions referred to in Nebeker's declaration govern "the physical administration of health care services," they cannot replace the community standard of care for nurses or nurse practitioners in the Post Falls/Coeur d'Alene area. As such, Nebeker could not use these general statewide regulations to familiarize herself with the community standard of care for nurses and nurse practitioners in the Post Falls/Coeur d'Alene area in March of 2015.

In sum, none of the various sources relied upon by Nebeker in her declaration demonstrated that she had "actual knowledge" of the community standard of care. Accordingly, the district court did not abuse its discretion in concluding that Nebeker's declaration was inadmissible for purposes of establishing the applicable community standard of care on summary judgment.

5. Summary.

The district court did not err in concluding that none of the expert declarations supplied by the Fisks on summary judgment provided adequate foundation for any of their experts to testify as to the applicable community standard of care in the Post Falls/Coeur d'Alene area during March 2015. Because such testimony is required under Idaho Code sections 6-1012 and 6-1013 to establish the standard of care in a medical malpractice claim, the Fisks failed to establish an essential element of their case. Therefore, the district court did not err in granting summary judgment in favor of McDonald and the Hospital.

**B. The district court did not err by ruling that the burden was on the Fisks to establish the essential elements of their case on summary judgment.**

The Fisks argue that the district court erred in granting summary judgment because McDonald and the Hospital supported their motions for summary judgment with conclusory expert affidavits that did not establish the applicable standard of care, and thus, the burden never

shifted to the Fisks to produce evidence in opposition to the motion. In response, McDonald and the Hospital argue that summary judgment was properly granted because the Fisks were unable to produce admissible evidence to establish an essential element of their medical malpractice claim.

Summary judgment is appropriate where the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "The burden of proving the absence of a genuine issue of material fact rests at all times on the moving party." *Bromley v. Garey*, 132 Idaho 807, 810, 979 P.2d 1165, 1168 (1999) (citing *Tingley v. Harrison*, 125 Idaho 86, 89, 867 P.2d 960, 963 (1994)). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Chandler v. Hayden*, 147 Idaho 765, 771, 215 P.3d 485, 491 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "[w]here the non-moving party will bear the burden of proof at trial, the moving party's burden may be satisfied by showing the absence of material fact with regard to any essential element of the non-moving party's claim." *Bromley*, 132 Idaho at 810, 979 P.2d at 1168 (citing *Celotex*, 477 U.S. at 317). "Once the absence of sufficient evidence on an element has been shown, the burden shifts to the non-moving party to establish a genuine issue of material fact." *Id.* At that point, "[t]he non-moving party cannot merely rely upon its pleadings, but must produce affidavits, depositions, or other evidence establishing an issue of material fact." *Id.* at 810–11, 979 P.2d at 1168–69.

Under Idaho Code section 6-1012, a medical malpractice plaintiff must affirmatively prove the standard of care element by direct expert testimony "as an essential part of his or her case in chief." In other words, when confronted by a defendant's motion for summary judgment in a medical malpractice case, the only way for a plaintiff to establish a prima facie case is through competent expert testimony on the standard of care.

In this case, both McDonald and the Hospital asserted that they were entitled to summary judgment because the Fisks had failed to establish the standard of care through expert testimony. Because the Fisks would bear the ultimate burden of proof on this element at trial, McDonald's and the Hospital's argument, if successful, would satisfy their initial burden to demonstrate the absence of material fact under I.R.C.P. 56(a). *Bromley*, 132 Idaho at 810, 979 P.2d at 1168 (citing *Celotex*, 477 U.S. at 317). That is, by arguing that the Fisks failed to produce admissible expert testimony as to the standard of care under Idaho Code section 6-1012, McDonald and the

21

Hospital challenged the Fisks' ability to establish an element essential to their claim, which caused the burden to shift to the Fisks to produce admissible evidence supporting that element. As detailed in Section A above, the Fisks failed to produce any admissible evidence establishing the community standard of care and, as a consequence, failed to establish an essential element of their medical malpractice claim. Therefore, summary judgment was appropriate. *See Eldridge v. West*, 166 Idaho 303, 312–13, 458 P.3d 172, 181–82 (2020) ("If a plaintiff in a medical malpractice action fails to provide expert testimony evidence that the defendant negligently failed to meet the applicable standard of health care, the medical defendant is entitled to summary judgment.") (quoting *Mattox*, 157 Idaho at 473, 337 P.3d at 632 (citation omitted)). Inasmuch as the Fisks failed to make the requisite showing, expert declarations from McDonald or the Hospital's witnesses were unnecessary in order for the district court to grant summary judgment against the Fisks.

Nonetheless, the Fisks argue that McDonald and the Hospital were required to submit expert declarations establishing the community standard of care in order to succeed on summary judgment. The Fisks cite to *Mattox v. Life Care Centers of America Inc.*, 157 Idaho 468, 337 P.3d 627 (2014), in support of their argument. In *Mattox*, we noted that "it is not unusual for a defendant in a medical malpractice case to support a motion for summary judgment with an affidavit stating in very general, conclusory terms that the defendant complied with the applicable standard of care." 157 Idaho at 472 n.1, 337 P.3d at 631 n.1. However, because we were reversing the summary-judgment decision on other grounds, we explained that:

> We leave for another day the question of whether such an affidavit is admissible evidence and sufficient to shift the burden of production to the plaintiff in a medical malpractice case. We do, however, observe that whether an affidavit is submitted in support of, or in opposition to, a motion for summary judgment, it must contain admissible evidence. In a malpractice case that would include at a minimum the identification of the standard(s) of care at issue in the case.

*Id.* Thus, we left open the possibility that a conclusory expert affidavit submitted by the defense in a medical malpractice case could be insufficient to shift the burden of production to the plaintiff if it did not identify the standard of care at issue.

While that possibility remains open, it is not implicated by the facts of the case currently before us. There is a distinction between (a) providing a conclusory expert affidavit to *affirmatively* establish that the defendant did not fall below the applicable standard of care, and (b) demonstrating that the plaintiff has failed to establish the standard of care in their own expert

22

affidavits or declarations. Our recent decision in *Eldridge v. West*, 166 Idaho 303, 458 P.3d 172 (2020), highlights the difference.

In *Eldridge*, a patient brought a medical malpractice action against the doctor who performed his hip replacement surgery when he developed MRSA following the surgery. *Id.* at 306–07, 458 P.3d at 175–76. In a motion for summary judgment, the doctor alleged that the patient "failed to produce admissible evidence that showed that they had breached the applicable standard of care." *Id.* at 307, 458 P.3d at 176. In support of his motion for summary judgment, the doctor submitted his own affidavit, generally asserting that he had acted consistently with the applicable standard of care, but not describing that standard or how the treatment he provided conformed to it. *Id.* The patient moved to strike the portion of the doctor's affidavit discussing the standard of care on the grounds that it was conclusory. *Id.*

After the district court denied the motion to strike, this Court granted the patient's application for permissive appeal and we reversed the district court's decision on the grounds that that the conclusory expert affidavits did not comply with Idaho Rule of Civil Procedure 56(c)(4)'s admissibility or competency requirements. *Id.* at 311–312, 458 P.3d at 180–81. We explained that to satisfy Rule 56(c)(4)'s admissibility requirements in a medical malpractice case, an affidavit submitted by a defendant would be required to, "at a minimum, include an identification of the standard of care applicable to the behavior in question." *Id.* at 312, 458 P.3d at 181 (citing *Mattox*, 157 Idaho at 472 n.1, 337 P.3d at 631 n.1). Because the doctor's affidavit was conclusory as to the standard of care, the district court abused its discretion in denying the patient's motion to strike them. *Id.*

Importantly, we took care in *Eldridge* to distinguish between the admissibility requirements in Rule 56(c)(4) and the "level of evidence required of a moving party in order to shift the burden during a motion for summary judgment." *Id.* (citing *Foster v. Traul*, 141 Idaho 890, 893, 120 P.3d 278, 281 (2005)). For example, we reversed the district court's order granting summary judgment in favor of the doctor because its decision specifically relied upon the inadmissible affidavit. *Id.* Conversely, we affirmed the district court's order granting summary judgment in favor of the doctor's physician's assistant (even though she also submitted a conclusory affidavit) because she had successfully argued that the plaintiff failed to provide expert testimony establishing the standard of care applicable to physician's assistants within the relevant community. *Id.* at 311–12, 458 P.3d at 181–82.

In sum, *Mattox* and *Eldridge* do not require a defendant to provide expert testimony establishing the applicable standard of care to succeed on summary judgment in every case. Rather, these cases demonstrate the difference between the admissibility requirements for affidavits used in support of a summary judgment motion and the burdens of production required *in responding to* a motion for summary judgment. A defendant in a medical malpractice case may shift the burden to the plaintiff on motion for summary judgment in more than one way. While a defendant may submit expert affidavits to shift the burden of production to the plaintiff, a defendant may also shift the burden by demonstrating that the plaintiff failed to establish an essential element of their claim, such as the standard of care. Where a defendant submits an expert affidavit, and the district court relies on it to grant summary judgment, the affidavit must be admissible under Rule 56(c)(4).

Here, because the district court granted summary judgment on the basis that the Fisks failed to establish an essential element of their medical malpractice claim, its decision was not based on expert testimony submitted by McDonald or the Hospital. As such, the conclusory nature or admissibility of any such testimony is immaterial to the district court's decision. Therefore, the district court did not err in determining that the burden was on the Fisks to establish the essential elements of their medical malpractice claim.

**C. The district court erred in denying the Fisks' motions for reconsideration.**

After the district court awarded summary judgment to McDonald and the Hospital, the Fisks moved for reconsideration and included with their motion supplemental expert declarations. The district court denied the motions on the grounds that the additional declarations failed to show that the Fisks' experts had actual knowledge of the community standard of care. The Fisks argue that the district court erred in denying their motions for reconsideration. They assert that the district court failed to consider additional expert declarations submitted in support of the motions and applied the wrong standard for reconsideration. McDonald and the Hospital argue that the district court considered the additional expert declarations submitted on reconsideration and correctly concluded that they did not provide admissible evidence of the community standard of care.

Idaho Rule of Civil Procedure 11.2(b)(1) provides:

A motion to reconsider any order of the trial court entered before final judgment may be made at any time prior to or within 14 days after the entry of a final judgment. A motion to reconsider an order entered after the entry of final judgment must be made within 14 days after entry of the order.

24

I.R.C.P. 11.2(b)(1). The district court has no discretion to decide whether to entertain a motion for reconsideration. *Fragnella v. Petrovich*, 153 Idaho 266, 276, 281 P.3d 103, 113 (2012). In addition, the district court "must consider any new admissible evidence or authority bearing on the correctness of [the] order." *Jackson v. Crow*, 164 Idaho 806, 811, 436 P.3d 627, 632 (2019) (quoting *Fragnella*, 153 Idaho at 276, 281 P.3d at 113).

> When deciding the motion for reconsideration, the district court must apply the same standard of review that the court applied when deciding the original order that is being reconsidered . . . Likewise, when reviewing a trial court's decision to grant or deny a motion for reconsideration, this Court utilizes the same standard of review used by the lower court in deciding the motion for reconsideration.

*Id.*

Here, the district court was asked to reconsider an order granting summary judgment, so the summary judgment standard applied to the district court's decision on the motion for reconsideration and now applies to this Court's review of that decision on appeal. *Id.* "When the district court grants summary judgment and then denies a motion for reconsideration, this Court must determine whether the evidence presented a genuine issue of material fact to defeat summary judgment." *Id.* (quoting *Idaho First Bank v. Bridges*, 164 Idaho 178, 186, 426 P.3d 1278, 1286 (2018)).

The Fisks supported their motions for reconsideration with additional expert declarations from Nebeker, Kubiak, and Hawkins. Although the Fisks contend that the district court failed to consider these additional declarations, the district court explicitly stated "[t]he Court has reviewed the new affidavits" in its memorandum decision and order denying the motion for reconsideration. The district court simply found that the new declarations presented no new evidence of the applicable standard of care. After careful review, we agree with the district court in part, but hold that the district court erred with respect to the admissibility of Kubiak's testimony. We address each of the supplemental declarations.

Nebeker's second declaration explained that she reviewed the deposition of Nurse Miller who testified that her training included the ANA standards which "guide everything in nursing," that Miller understood that the Hospital incorporated the ANA standards into its protocols, and that nurses were expected to act in accordance with those standards. Nebeker's second declaration also indicated that Nurse Hetzler testified in her deposition that the ANA standards were incorporated into the Hospital's protocols. Nebeker reviewed those protocols and came to the conclusion that the Hospital had adopted the ANA standards. In addition, Nebeker's second

declaration explains that she confirmed her understanding of the community standard of care by consulting with three local healthcare practitioners, two of whom were associated with the Hospital. Specifically, she explains that she discussed "the standard of care for [a] patient who develops acute abdominal pain."

However, Nebeker's second declaration is insufficient for one of the same reasons as her first declaration; it does not spell out a single standard of care. Even if we were to conclude that Nebeker's second declaration established that the ANA standards of practice were the community standard of care for nurses, her second declaration does not contain any language from the ANA standards of practice or otherwise explain the contents of those standards in a way that provides a coherent standard of care. As such, the district court did not abuse its discretion in determining that Nebeker's second declaration was insufficient to establish that she had actual knowledge of the applicable community standard of care.

On the other hand, Kubiak's second declaration filled the void that was apparent in his first declaration by providing facts that, when taken as true, establish that the ANA standards of practice had been adopted as the community standard of care for nurses. Kubiak's second declaration provided significantly more detail explaining how he familiarized himself with the community standard of care. Like Nebeker's second declaration, Kubiak's second declaration explained that he reviewed the deposition of Nurse Miller who testified that her training incorporated the ANA standards, that the ANA standards "guide everything in nursing," that the Hospital had incorporated the ANA standards into its protocols, and that she understood that nurses were expected to act in accordance with the ANA standards. Kubiak further explained that he reviewed the depositions of Robin Hetzler, Pamela Carpenter, and nurse practitioner Jessica Sholtz, and that those depositions made clear that the nurses understood they were expected to comply with the ANA standards. Kubiak's second declaration also indicates that he reviewed the Hospital's protocols and determined that the Hospital had adopted the ANA standards.

Unlike Nebeker, Kubiak's first declaration contained numerous statements of the applicable standards of care. Generally, Kubiak explained that the standard of care for nurses is "typically defined as what a reasonable and prudent nurse would do when caring for a same or similar patient in the same or similar circumstances." Kubiak also included specific standards of care relevant to Mrs. Fisk's treatment. For example, he explained that "adequate pain management is a compelling and universal requirement," and that "[w]hen a patient states that he

26

or she believes he or she is dying, it is reasonable for the registered nurse to assume that something significant is happening and immediate care is needed." Furthermore, Kubiak explained that registered nurses are trained to understand that "coffee ground emesis can be a sign of abdominal bleeding and requires immediate intervention." With respect to documentation, Kubiak explained that "[c]lear, accurate, and accessible nursing documentation is an essential element of safe, quality, effective, and evidence based nursing according to the American Nurses Association." To that end, Kubiak explained that "all nursing care must be well documented."

Kubiak's first and second declaration, taken together, demonstrate that he reviewed the depositions of four local healthcare providers, along with the Hospital's internal policy statements to familiarize himself with the community standard of care. Specifically, his second declaration contains sufficient facts from the sources he reviewed to demonstrate that the ANA standards of practice, which he was familiar with, had been adopted as community standards of care. Because of his familiarity with the ANA standards, Kubiak was able to elucidate several standards of care that were applicable to nurses within the community. Therefore, Kubiak's second declaration provided sufficient additional information, such that, his two declarations, taken together, demonstrated his familiarity with the applicable community standards of care for nurses in the Post Falls/Coeur d'Alene area.

Finally, Hawkins's second declaration fails because, while it clarifies the interrelationship between the Joint Commission Standards and CMS, it fails to cure the deficiencies outlined earlier in this opinion. In his second declaration, Hawkins explained that CMS does not promulgate its own standards, but that a hospital may meet CMS's requirements to "formulate and implement standards for its facility" by adopting the Joint Commission Standards. Since the Hospital is a CMS participant, Hawkins explained that he believed the Hospital had adopted the Joint Commission Standards. Therefore, Hawkins asserted that he adequately familiarized himself with the community standard of care by relying on the Joint Commission Standards cited in his first declaration. However, Hawkins does not cite to any additional Joint Commission Standards beyond those relied upon in his first declaration. As explained, those standards cannot supplant the community standard of care because they do not "concern the physical administration of health services" or provide "actual concrete guidance with respect to the activities it purports to govern." *Navo v. Bingham Mem'l Hosp.*, 160 Idaho 363, 372–73, 373 P.3d 681, 690–91 (2016). Thus, Hawkins's second declaration failed to demonstrate actual

27

knowledge of the community standard of care for the same reasons his first declaration failed to do so.

In conclusion, the district court did not abuse its discretion to the extent that it concluded that Hawkins's second declaration and Nebeker's second declaration were inadmissible because they failed to demonstrate that either expert had actual knowledge of the community standard of care. However, because Kubiak's second declaration demonstrated that he had actual knowledge of the community standard of care, the district court abused its discretion in concluding that Kubiak's testimony as to the standard of care was inadmissible at the motion for reconsideration stage. Therefore, the district court erred in denying the Fisks' motions for reconsideration.

**D. The district court erred in determining that the Fisks failed to properly plead that McDonald was liable for the acts or omissions of Sholtz via the agency theory of liability.**

At the outset, we note that none of the Fisks' expert witnesses were directly critical of McDonald's conduct. While the experts claimed in their declarations that the conduct of Sholtz and the Hospital's nursing staff fell below the applicable standard of care, not a single expert purported to have knowledge of the community standard of care applicable to neurosurgeons such as McDonald or opined that McDonald's conduct fell below that standard of care. As such, the only reason we ultimately reverse the district court's grant of summary judgment in favor of McDonald is because of our conclusion in this section that the Fisks were not required to *plead* the agency theory of liability in order to hold McDonald liable for Sholtz's acts or omissions. That said, on remand the Fisks will still be required to *prove* the agency theory of liability to ultimately hold McDonald liable. Our holding is limited to the district court's determination regarding the Fisks' pleadings.

The district court held that McDonald cannot be liable for the acts and omissions of nurse practitioner Sholtz because the Fisks failed to plead a theory of express authority, implied authority, or apparent authority in their Complaint. The Fisks argue that the district court erred in requiring that they specifically plead an agency theory of liability in order to rely on the theory in arguing that McDonald was negligent.

"A cause of action not raised in a party's pleadings may not be considered on summary judgment nor may it be considered for the first time on appeal." *Navo v. Bingham Mem'l Hosp.*, 160 Idaho 363, 374, 373 P.3d 681, 692 (2016) (quoting *Maroun v. Wyreless Sys., Inc.*, 141 Idaho 604, 613, 114 P.3d 974, 983 (2005)). Idaho Rule of Civil Procedure 8(a) provides:

28

**(a) Claim for Relief.** A pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

I.R.C.P. 8(a).

However, "the technical rules of pleading have long been abandoned in Idaho, and the general policy behind the current rules of civil procedure is to provide every litigant with his or her day in court." *Navo*, 160 Idaho at 374, 373 P.3d at 692 (quoting *Brown v. Pocatello*, 148 Idaho 802, 807, 229 P.3d 1164, 1169 (2010)). "Accordingly, when reviewing a pleading, this Court should focus on ensuring 'that a just result is accomplished, rather than requiring strict adherence to rigid forms of pleading.'" *Id.* (quoting *Seiniger Law Office, P.A. v. N. Pac. Ins. Co.*, 145 Idaho 241, 246, 178 P.3d 606, 611 (2008)). "The purpose of a complaint is to inform the defendant of the material facts upon which the plaintiff rests the action." *Id.* Thus, "the key issue in determining the validity of a complaint is whether the adverse party is put on notice of the claims brought against it." *Id.* at 374–75, 373 P.3d at 692–93.

Express authority, implied authority, and apparent authority are theories by which an agency relationship arises between a principal and a third party. *Bailey v. Ness*, 109 Idaho 495, 497, 708 P.2d 900, 902 (1985). "One consequence of an agency relationship is that the principal becomes liable for the torts committed by the agent within the scope of agency." *Navo*, 160 Idaho at 375, 373 P.3d at 693. These three types of authority are not themselves causes of action. *Id.* They are legal theories giving rise to an agency relationship. *Id.*

"Under notice pleading, a party is no longer slavishly bound to stating particular theories in its pleadings." *Seiniger Law Office*, 145 Idaho at 246, 178 P.3d at 611. "Rather, a party is required to state an underlying cause of action and the facts from which that cause of action arises." *Navo*, 160 Idaho at 375, 373 P.3d at 693.

In their Complaint, the Fisks clearly allege a negligence cause of action against McDonald. Though they did not specifically include the terms "agency" or "agent," the Complaint refers to Sholtz as McDonald's physician assistant on multiple occasions. Furthermore, the Fisks' Complaint alleges that McDonald violated the standard of care as

29

described in Idaho Code section 6-1012. The agency theory of liability is included within the plain language of Idaho Code section 6-1012. *See* I.C. § 6-1012 ("In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including . . . any . . . nurse practitioner [or] registered nurse . . . or any person vicariously liable for the negligence of them . . . ."). We conclude that the Fisks' Complaint was sufficient to put McDonald on notice that the Fisks sought to hold him liable for the acts or omissions of Sholtz. The district court erred in determining that the Fisks were required to plead a specific agency theory of liability (i.e., express, implied, or apparent) to hold McDonald liable for Sholtz's acts or omissions.

**E. No party is entitled to attorney's fees on appeal.**

Both the Fisks and McDonald request attorney's fees pursuant to Idaho Code section 12-121. The Hospital has not requested attorney's fees on appeal.

Idaho Code section 12-121 provides:

In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation. This section shall not alter, repeal or amend any statute that otherwise provides for the award of attorney's fees.

I.C. § 12-121. When the dispositive issue on appeal is a question of law, an award of attorney's fees under section 12-121 is proper where "the law is well-settled and the appellant has made no substantial showing that the district court misapplied the law." *Elec. Wholesale Supply Co. v. Nielson*, 136 Idaho 814, 828, 41 P.3d 242, 256 (2001) (citations omitted). "An award under [Idaho Code section] 12-121 is appropriate where an appeal presents no meaningful issue on a question of law but simply invites the appellate court to second-guess the trial judge on conflicting evidence." *Id.*

Under this standard, no party is entitled to attorney's fees because several meaningful issues of law have been raised in this appeal. The arguments of the parties revolved around genuine issues of law regarding the requirements for an out-of-area expert to become familiar with the community standard of care in a medical malpractice action. Thus, we decline to award attorney's fees to either party.

## V. CONCLUSION

For the above reasons, we conclude that the district court did not err in initially granting summary judgment in favor of McDonald and the Hospital. However, we further conclude that

30

the district court erred in denying the Fisks' motions for reconsideration and that the district court erred in determining that the Fisks were required to plead a specific agency theory of liability (i.e., express, implied, or apparent) in order to hold McDonald accountable for Sholtz's acts or omissions. Accordingly, the district court's judgments dismissing the Fisks' medical malpractice claims against McDonald and the Hospital are vacated. This case is remanded for further proceedings consistent with this opinion. No attorney's fees or costs are awarded on appeal.

Justices BRODY, BEVAN, STEGNER, and MOELLER **CONCUR.**