# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47149

<table>
<tr>
<td>

CASSIE ALBERTA SECOL, an individual;<br>
CASSIE ALBERTA SECOL as the legal<br>
guardian and parent for and on behalf of<br>
A.S., a minor child; L.S., a minor child;<br>
C.S., a minor child; and E.S., a minor child,

Plaintiffs-Appellants,

v.

FALL RIVER MEDICAL, P.L.L.C., dba<br>
FALL RIVER FAMILY MEDICINE &<br>
URGENT CARE, a professional limited<br>
liability company; KELLY L. DUSTIN,<br>
D.O., in his individual and official capacity;<br>
and AUSTIN C. GILLETTE, M.D., in his<br>
individual and official capacity,

Defendants-Respondents.

</td>
<td>

Boise, December 2020 Term

Opinion Filed: March 22, 2021

Melanie Gagnepain, Clerk

</td>
</tr>
</table>

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Madison County. Jon J. Shindurling, District Judge.

The district court's decisions are reversed in part and affirmed in part. The final judgment is vacated and the matter remanded for further proceedings.

Hall Angell & Associates, LLP, Idaho Falls, for Appellants. Sam L. Angell argued.

Thomsen Holman Wheiler, PLLC, Idaho Falls, for Respondents. Richard R. Friess argued.

_____

BURDICK, Justice.

In an appeal from the Madison County district court, Cassie Secol and her four minor children (collectively "the Secols") challenge several evidentiary rulings, jury instructions, and the denial of their motion for a new trial. This case concerns, among other things, whether a district court prevented a fair trial when it questioned an expert witness in front of the jury concerning critical liability issues in the case.

1

In late 2016, Damian Secol passed away from a rare form of cancer, T-cell lymphoblastic lymphoma ("T-LBL"). Following his death, the Secols brought this medical malpractice action against Damian's primary care providers—Kelly L. Dustin, D.O., Austin C. Gillette, M.D., and Fall River Medical, PLLC (collectively "Fall River"). At trial, the district court questioned Dr. Jeffery D. Hancock, Damian's treating oncologist, in front of the jury concerning the treatment and diagnosis of T-LBL. The Secols moved the district court for a mistrial, arguing the questioning prevented a fair trial. The district court denied the motion. After the jury returned a verdict in Fall River's favor, the Secols moved the district court for a new trial, which was also denied. The Secols appealed, challenging the district court's evidentiary rulings, delivery of jury instructions, and the denial of their motion for a new trial.

We reverse the district court, vacate the judgment following the jury verdict, and remand for a new trial to be conducted by a new district judge.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A. Damian Secol's treatment at Fall River and diagnosis with T-LBL.

In the spring of 2016, Damian Secol scheduled an appointment at his primary care provider, Fall River Family Medicine, due to persistent coughing and a feeling that his throat was closing off when he lay down. During this first visit, on June 6, 2016, Damian[1] was seen by Austin C. Gillette, M.D. Dr. Gillette noted that Damian "feels like his throat is closing off some, [has] some coughing fits, irritation in the throat but not a lot of sore throat, [and] feels . . . sometimes worse when sleeping[,] especially if on the back." In total, Damian visited Fall River at least six times between June 6, 2016, and July 15, 2016, complaining of respiratory problems such as "shortness of breath," "difficulty breathing," and feeling like his "throat [was] tightening up." At each visit, Damian saw either Dr. Gillette or Kelly L. Dustin, D.O. At no point in time did either doctor conduct an x-ray of Damian's chest.

On June 21, 2016, Cassie attended Damian's third visit to Fall River and recalled asking Dr. Dustin to perform a chest x-ray, which Dr. Dustin declined to do because he believed Damian's symptoms were due to allergies or asthma. Dr. Dustin did not recall being asked to perform an x-ray but confirmed that he did not perform an x-ray at that visit.

---

[1] For clarity, members of the Secol family are referred to by their first name; all others are referred to by their last name and title.

Without a diagnosis and with worsening symptoms, Cassie and Damian's frustrations with the care at Fall River came to a head following Damian's last appointment there on Friday, July 15. That weekend, on Sunday, swelling in Damian's chest and neck prevented him from buttoning the top two buttons on his dress shirt before church. The couple resolved to drive to Eastern Idaho Regional Medical Center ("EIRMC") the next day for different care.

At EIRMC, doctors performed chest x-rays and a CT scan, discovering a mass in Damian's chest measuring 17 cm by 12 cm by 12 cm, roughly the size of a large cantaloupe. A biopsy of the mass revealed a rare and fast-growing form of cancer, T-LBL. Doctors at EIRMC immediately arranged to have Damian transferred to LDS Hospital/Intermountain Healthcare ("LDSH") in Salt Lake City to receive treatment. Damian began treatment at LDSH and was eventually referred to Jeffrey D. Hancock, M.D., a pediatric oncologist practicing in the Rexburg area, to continue his treatment.

Dr. Hancock began treating Damian in early August 2016 and Damian successfully completed the first stage of an aggressive chemotherapy protocol. However, during the second stage of his treatment, Damian's condition deteriorated and he was transferred back to LDSH in mid-November. Damian was discharged from LDSH on December 1, 2016, and died at home the following day.

### B. Procedural history.

After Damian's death, the Secols filed suit against Fall River, claiming medical malpractice, respondeat superior liability, negligent failure to train, and willful or reckless conduct. The core of the Secols' complaint is that Dr. Austin and Dr. Gillette breached the standard of care by not ordering a chest x-ray for Damian, which led to a delay in the diagnosis and treatment of his T-LBL. After filing their complaint, the Secols moved the district court to allow them to amend their complaint to include a claim of punitive damages under Idaho Code section 6-1604. The district court granted this motion and the Secols filed their amended complaint in December 2018.

During discovery, Fall River disclosed two retained expert witnesses to testify on the standard of care: Johnathan Cree, M.D., and Eric Pertulla, M.D. In addition to Dr. Cree and Dr. Pertulla, Fall River also disclosed Dr. Hancock, Damian's treating oncologist, as a non-retained expert witness. The Secols then filed a motion in limine to limit Fall River to one expert witness

3

on the standard of care. The district court granted the motion[2] but the district judge presiding over the case was subsequently appointed to this Court and a new district judge was assigned to the case. Following the assignment of a new district judge, Fall River moved the district court to reconsider its previous order limiting Fall River to one expert on the standard of care. The district court granted the motion to reconsider and allowed Fall River to call both Dr. Cree and Dr. Pertulla to testify as to the standard of care.

The jury trial began March 19, 2019. After the Secols rested their case, Fall River moved for a directed verdict on all the Secols' claims. The district court granted Fall River's motion with respect to the respondeat superior, negligent failure to train, and punitive damages claims. However, the district court did not grant Fall River's motion for a directed verdict on the medical malpractice claim, choosing instead to briefly reopen the Secols' case to allow them to cure a technical error in their expert testimony that would otherwise have been fatal to the claim.

Subsequently, as part of their case in chief, Fall River called Dr. Hancock to testify concerning Damian's treatment and whether his prognosis would have been different had he been diagnosed six weeks earlier. Prior to trial, the Secols had filed a motion in limine to limit Dr. Hancock's testimony to his observations and treatment of Damian, but the district court denied this motion. The Secols also objected multiple times to testimony from Dr. Hancock concerning the effect a six-week delay in diagnosis had on Damian's prognosis. The district court overruled these objections. Following the Secols' cross-examination of Dr. Hancock, and redirect examination by Fall River, the district court directly questioned Dr. Hancock in front of the jury. The Secols conducted further cross-examination and moved to strike Dr. Hancock's testimony as outside the scope of Damian's treatment, which the district court again overruled.

The following day, outside the presence of the jury, the Secols moved for a mistrial, arguing that the district court's questioning of Dr. Hancock had prevented a fair trial. The district court denied the motion, reasoning that its questioning clarified the evidence presented and did not express any prejudice towards or endorsement of a party.

With respect to jury instructions, the Secols objected to a proposed instruction that deviated from the standard jury instruction for medical negligence by requiring both breach and causation be proved by "direct expert testimony." The Secols also objected to the district court's refusal to give their proposed instruction on punitive damages following the district court's grant

---

[2] The order granting the Secols' motion in limine has not been provided in the record on appeal.

4

of a directed verdict on that claim. Eventually, the district court modified the proposed instruction on medical malpractice and instructed the jury that the Secols had the burden to prove "[b]y direct expert testimony that [Fall River] failed to meet the applicable standard of care" and that causation must be proved by "expert testimony."

The jury returned a verdict in favor of Fall River on March 28, 2019. Following the verdict, the Secols moved the court for a directed verdict or, in the alternative, a new trial. The Secols argued that the district court's questioning of Dr. Hancock prevented a fair trial and that the district court's reconsideration of its motion in limine prejudiced them. The district court denied the motion, ruling that sufficient evidence supported the jury's verdict, that the district court's questioning of Dr. Hancock did not deprive the Secols of a fair trial, and that the district court's reconsideration of its prior order did not prejudice the Secols.

The Secols timely appealed.

## II. ISSUES ON APPEAL

1. Did the district court abuse its discretion in denying the Secols' motion for a new trial based on its questioning of Dr. Hancock?

2. Did the district court abuse its discretion in allowing Dr. Hancock to testify as to matters outside the scope of his role as a treating oncologist?

3. Did the district court abuse its discretion in allowing Fall River to call two expert witnesses on the local standard of care?

4. Did the district court err in permitting Dr. Dustin and Dr. Gillette to testify concerning their families and hobbies?

5. Did the district court appropriately instruct the jury on medical malpractice?

6. Did the district court err in granting a directed verdict on the Secols' claim of punitive damages?

7. Is either party entitled to attorney's fees on appeal?

## III. ANALYSIS

### A. The district court abused its discretion in denying the Secol's motion for a new trial.

1. Standard of Review

A trial court's decision to grant or deny a motion for a new trial is reviewed according to an abuse of discretion standard. *Blizzard v. Lundeby*, 156 Idaho 204, 206, 322 P.3d 286, 288 (2014). Under that standard, this Court asks: "[w]hether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4)

reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

    2. <u>Analysis</u>

The district court abused its discretion in denying the Secol's motion for a new trial because its questioning of Dr. Hancock and its related statements prevented a fair trial by impermissibly commenting on the evidence and the critical issue of liability.

Following cross-examination by the Secols' counsel, and redirect examination by Fall River's counsel, the district court engaged in the following exchange with Dr. Hancock:

> THE COURT: I've got a couple of questions, which will help me. I've got some thoughts that haven't been answered. May I ask some questions?
>
> MR. ANGELL [for the Secols]: Sure, yeah.
>
> . . . .
>
> THE COURT: Doctor, it's been suggested, or at least implied by the questioning, that this disease should have been diagnosed potentially on the first presentation to the primary care provider on June 6. Is that likely?
>
> THE WITNESS: No.
>
> THE COURT: Now, you mentioned in your case that in a young person that you are treating, four months before diagnosis, that is before presentation by the oncologist . . . was being treated for asthma.
>
> THE WITNESS: Allergies and asthma.
>
> THE COURT: Allergies and asthma. What does the primary care provider face when initially seeing symptoms which ultimately, in hindsight, were symptoms of disease?
>
> THE WITNESS: Well, that's the dilemma. They're dealing with an entity which is exquisitely [sic] common in allergy and asthma.
>
> THE COURT: Or colds or flu or anything else?
>
> . . . .
>
> THE WITNESS: Correct, yes, yes. I go out and I lecture for the Huntsman Cancer Institute about leukemia and lymphoma.
>
> THE COURT: Okay.
>
> THE WITNESS: And I always tell people that the only good diagnostic criteria that I know for cancer is it doesn't get better.
>
> THE COURT: Okay. Well, my question is: [a]ssuming that a primary care provider is going through a differential diagnosis –
>
> THE WITNESS: Right.
>
> THE COURT: – process, symptoms that are presented –

THE WITNESS: Right.

THE COURT: – trying to figure out what's going on, treating things that may or may not have some effect –

THE WITNESS: Right.

THE COURT: – at what point, in your experience, does the patient come to you?

THE WITNESS: Timing wise?

THE COURT: Yes.

THE WITNESS: After a couple of months, when somebody has done an X-ray or a CAT scan and we see that there's a mass.

THE COURT: And from your viewpoint, does that mean that the primary case [sic] provider proceeded inappropriately?

THE WITNESS: Never.

THE COURT: All right [sic]. Thank you. That's the questions I had. I think that we needed to focus on that point of view –

. . . .

THE COURT: – because we're talking about that six weeks and the testimony hasn't focused on that.

Fall River argues that this questioning did not prejudice the Secols because it was merely clarifying the evidence and, if it did cause prejudice, the district court's delivery of a remedial instruction cured any error. Further, Fall River argues that the Secols did not preserve this issue for appeal because they did not make a timely objection. We first address whether this issue was preserved, before turning to the prejudicial effect of the questioning and the impact of the remedial instruction.

>    a. *The propriety of the district court's questioning of Dr. Hancock has been preserved for appeal.*

A motion for new trial under Idaho Rule of Civil Procedure 59(a) is not a vehicle for preserving evidentiary issues that were not objected to at trial. *See State v. Higgins*, 122 Idaho 590, 596, 836 P.2d 536, 542 (1992) ("A motion for new trial based on the admission of evidence to which the moving party did not object at trial, however, is not a sufficient means of preserving the issue for appeal."). Instead, to preserve an evidentiary issue for appeal a party must "timely object[] or move[] to strike" on the record and state the specific grounds for that objection, "unless it [is] apparent from the context." I.R.E. 103(a)(1). Idaho Rule of Evidence 614 governs when an objection must be made to a district court's questioning of a witness. That rule provides

7

"[a] party may object to the court's examining a witness either at that time o*r at the next opportunity when the jury is not present*." I.R.E. 614(c) (emphasis added).

The Secols did not immediately object to the district court's questioning of Dr. Hancock . Instead, they asked to engage in further cross-examination of Dr. Hancock, which the district court allowed. Following re-cross examination, the Secols moved to strike Dr. Hancock's testimony concerning how a primary care physician would diagnose T-LBL. The district court denied the motion. Subsequently, the next morning of trial, the Secols moved the district court for a mistrial outside the presence of the jury based on its questioning of Dr. Hancock. The district court denied this motion as well, reasoning that its questions were designed to clarify the testimony and focus the jury on the proper timeframe in which the alleged medical malpractice occurred. Finally, after the jury's verdict, the Secols moved the district court for a new trial under Rule 59(a), arguing again that the district court's questioning deprived them of a fair trial.

Based on the above, we conclude the Secols have preserved for appeal the issue of whether the district court abused its discretion in questioning Dr. Hancock. It is clear from the context of the Secols' motion to strike that they were disputing the propriety of the district court's questioning and the testimony it elicited. Further, the Secols' motion for a mistrial, coming at the next opportunity outside the presence of the jury and stating with particularity the Secols' objections to the district court's questioning, complies with the mandate of Idaho Rule of Evidence 614(c).

b. *The district court's questioning deprived the Secols of a fair trial.*

Under Idaho Rule of Civil Procedure 59, a court may grant a motion for a new trial on the basis of "any order of the court or abuse of discretion by which either party was prevented from having a fair trial[.]" I.R.C.P. 59(a)(1)(B). Thus, to determine whether the district court abused its discretion in denying the Secols' motion for a new trial, we look to whether the district court abused its discretion when it questioned Dr. Hancock. We conclude that the district court did abuse its discretion in questioning Dr. Hancock and, in turn, prevented a fair trial.

Idaho Rule of Evidence 614(b) provides that a trial court "may examine a witness regardless of who calls the witness." I.R.E. 614(b). However, exercise of this authority is fraught with the risk that the jury will be influenced in their deliberations by their perception of the court's opinion of an issue. *See Milton v. State*, 126 Idaho 638, 642, 888 P.2d 812, 816 (Ct. App. 1995). Indeed, "[t]here is also a risk that the jury will attach undue significance to the subject

8

matter of the court's questions, for if the court thinks the issue important enough to inquire further of the witness, why should not the jury?" *Id.* This is why the discretion to question a witness is not unbounded, and a court exercising this power must not "comment on the weight of the evidence" or express an "opinion as to the evidence . . . relat[ing] to a critical issue in the case." *See State v. White*, 97 Idaho 708, 712, 551 P.2d 1344, 1348 (1976) (citations omitted). Accordingly, a trial court's questioning of a witness is limited to "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." *State v. Lankford*, 116 Idaho 860, 875, 781 P.2d 197, 212 (1989) (quoting *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977)).

We conclude that the district court's questioning of Dr. Hancock was an abuse of discretion because it commented on the weight to be given to the Secols' evidence and expressed an opinion as to the critical issue of liability in this case. Although the district court recognized that it had discretion to question the witness, it failed to act within the bounds of that discretion and acted inconsistently with applicable legal standards.

To begin, the district court's questioning of Dr. Hancock exceeded the bounds of its discretion because it actively solicited impermissible testimony. Although a district court has the power to examine any witness, that examination is bounded by the same rules of evidence that confine counsel in the case. I.R.E. 101(b) ("These rules govern all cases and proceedings in the courts of the State of Idaho . . . ."). Here, not only was Dr. Hancock's testimony in response to the district court's questions prejudicial to the Secols, it lacked foundation. Fall River never made a showing that Dr. Hancock was familiar with the applicable standard of care nor did Fall River attempt to ask Dr. Hancock any questions in that regard. In fact, Dr. Hancock explicitly stated in his deposition that he was not familiar with the standard of care for primary care providers. Notwithstanding this lack of foundation, the district court asked Dr. Hancock if it was "likely" that Damian would have been diagnosed at his first visit to Fall River. Dr. Hancock responded that it was not likely. The district court continued in the active solicitation of evidence by asking Dr. Hancock if Damian's symptoms could be mistaken for allergies, asthma, a cold, the flu, "or anything else." In addition, the district court asked Dr. Hancock if he believed that a primary care provider acts inappropriately when he does not diagnose T-LBL within a matter of months, to which Dr. Hancock answered "never." Considering that the critical issue in the Secols' case is whether Fall River should have conducted a chest x-ray to diagnose Damian's

9

illness, a commentary on the likelihood of such a diagnosis, the probability that it might be mistaken for a more benign illness, or whether a primary care provider acted inappropriately in not conducting an x-ray, is inextricably linked with the question of breach of the standard of care. In essence, the district court's questions provided a backdoor for an unqualified witness to offer standard of care opinions. As such, the district court exceeded the boundaries of its discretion by prompting Dr. Hancock to testify without foundation.

The district court also acted inconsistently with the applicable legal standards by commenting on the weight to be afforded the Secols' evidence. For instance, the district court began its questioning by mentioning it had "some thoughts that haven't been answered" and that it had only "been suggested, or at least implied" that Fall River should have diagnosed Damian's disease earlier. These observations, coming soon after the close of the Secols' case, undermined both the amount and quality of the Secols' evidence in the eyes of the jury. The district court's comment that it had unanswered questions tends to suggest that the district court did not believe the Secols had presented adequate evidence during their case. Similarly, its comment that the evidence that had been presented merely implied or suggested certain facts called into question the weight of the expert testimony offered by the Secols during trial. In short, the district court improperly suggested to the jury that, although the Secols had rested their case, there remained loose ends and that the previous expert testimony amounted to only an implication of medical negligence.

Finally, the district court acted inconsistently with applicable legal standards when it expressed an opinion as to the critical issue of liability in the case. The district court concluded its questioning of Dr. Hancock by asking him if "from [his] viewpoint" a primary care provider "proceeded inappropriately" when they did not diagnose a patient with T-LBL after a matter of months. Dr. Hancock responded that in his point of view a primary care provider "never" proceeds inappropriately when so doing. The district court then stated: "Thank you. That's the questions I had. I think that we needed to focus on that point of view." This explicit endorsement of Dr. Hancock's point of view, made in front of the jury and coupled with the instruction that "*we need*[] *to focus on that point of view*" is an impermissible and highly prejudicial opinion on the critical issue of liability in the case. This commentary not only conveys to the jury that the district court did not believe that the defendants breached the standard of care, but also instructs the jury to adopt that interpretation of the evidence. Such a remark is the embodiment of the risk

10

this Court has admonished trial courts to avoid when exercising their discretion to question a witness under Idaho Rule of Evidence 614.

To summarize, the district court abused its discretion in questioning Dr. Hancock, and that abuse denied the Secols a fair trial. The district court recognized that posing questions was within its discretion but did not act within the boundaries of that discretion nor consistently with the legal principles applicable to the exercise of its authority. Accordingly, the district court abused its discretion in refusing to grant the Secols' motion for a new trial.

  *c. The district court's delivery of a remedial instruction did not cure the prejudice.*

In some circumstances, a jury instruction to disregard any expression of the trial court's opinion on the outcome of the case can cure any potential prejudice caused by a trial court's comments. *See State v. Lovelass*, 133 Idaho 160, 166, 983 P.2d 233, 239 (Ct. App. 1999). However, where a court's comments "reflect[] the court's opinion as to the evidence in a clear and unambiguous manner, and when it relates to a critical issue in the case" a remedial instruction will not suffice to cure prejudice. *See White*, 97 Idaho at 712, 551 P.2d at 1348.

Where a trial court's remarks have minimal prejudicial impact, a remedial instruction may be sufficient to cure the error. *See Lovelass*, 133 Idaho at 165–66, 983 P.2d at 238–39. For example, in *Lovelass*, the trial court questioned a criminal defendant in front of the jury about inconsistencies in his testimony. *Id.* at 164–65, 983 P.2d at 237–38. The Court of Appeals held that the questioning did not amount to fundamental error[3] because the trial court had not singled out the defendant for questioning and asked only clarifying questions. *Id.* at 238–39, 983 P.2d at 165–66. Further, while the Court of Appeals "caution[ed] against a trial court engaging in questioning which may give the impression of bias or prejudice," it determined that the trial court's delivery of a remedial instruction cured any potential prejudice. *Id.* at 166, 983 P.2d at 239.

In contrast, where a trial court clearly expresses its view of the weight of the evidence, a remedial instruction is insufficient to cure prejudice. *See White*, 97 Idaho at 712, 551 P.2d at 1348. In *White*, the trial court made a remark when ruling on an evidentiary objection that undercut the evidence of a party with respect to a critical issue in the case. *Id.* at 711–12, 551 P.2d at 1347–48. This Court reasoned that the trial court's commentary "went beyond the bounds

---

[3] Because the trial court's questioning was not objected to at trial, the Court employed the fundamental error standard of review for criminal proceedings. *Lovelass*, 133 Idaho at 165, 983 P.2d at 238.

of mere elucidation" and instead "constituted [an] expression of opinion about the evidence in the presence of the jury." *Id.* at 712, 551 P.2d at 1348. Under these circumstances, we held that the trial court's remarks constituted prejudicial error notwithstanding the trial court's delivery of a remedial instruction to the jury. *Id.* at 712 n.3, 551 P.2d at 1348 n.3.

Here, the district court delivered the following remedial instruction to the jury:

> If during the trial I may say or do anything which suggests to you that I am inclined to favor the claims or position of any party, you will not permit yourself to be influenced by any such suggestion. I will not express, intend to express nor will I intend to intimate, any opinion as to which witnesses are or are not worth of belief; what facts are or are not established; or what inferences should be drawn from the evidence. If any expression of mine seems to indicate an opinion relating to any of these matters, I instruct you to disregard it.

This is the same remedial instruction delivered in *Lovelass*, which the Court of Appeals found to cure potentially prejudicial comments. However, unlike *Lovelass*, in this case the prejudice caused by the district court's questioning is too substantial to purge with a curative instruction.

We conclude that the remedial instruction was not sufficient to cure prejudice caused by the district court because its questioning constituted a commentary on the weight of the evidence and on the critical issue of whether Fall River breached the standard of care. As explained above, the district court's questions unnecessarily cast doubt on the weight of the Secols' expert testimony and explicitly endorsed the point of view that a primary care physician does not act inappropriately when failing to diagnose T-LBL within a few months.[4] As such, the district court's remedial instruction is insufficient to correct the error and the proper remedy is a new trial.

**B. The district court abused its discretion in permitting Dr. Hancock to testify as to matters outside the scope of his role as Damian's treating oncologist.**

    1.   <u>Standard of Review</u>

A district court's decision to admit evidence is reviewed using an abuse of discretion standard. *Mulford v. Union Pac. R.R.*, 156 Idaho 134, 138, 321 P.3d 684, 688 (2014). Accordingly, this Court applies the same four-part standard described above. *See Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted).

---

[4] This is not to say that a primary care provider has definitively breached the standard of care if they do not diagnose T-LBL within months. Rather, the specific facts of the case must be assessed to determine what care should have been provided under the circumstances.

2. Analysis

The Secols argue that the district court abused its discretion in allowing Dr. Hancock to testify on issues relating to Damian's primary care at Fall River. They contend that Dr. Hancock lacked the foundation to testify as an expert concerning that care and that he was not properly disclosed as an expert witness. Fall River, in response, maintains that Dr. Hancock did not offer testimony as to the applicable standard of care and was imminently qualified to offer his opinion as to causation. In addition, they argue that Dr. Hancock was properly disclosed as a non-retained expert pursuant to the Idaho Rules of Civil Procedure.

For the reasons set forth below, we conclude that the district court abused its discretion in permitting Dr. Hancock to testify about Damian's treatment at Fall River because Dr. Hancock lacked the foundation to offer that testimony. Consequently, Dr. Hancock's testimony should have been limited to the permissible bounds of his expert witness disclosure.

The standard for whether an expert is qualified to testify in a medical malpractice case varies by which issue an expert is offering testimony on. *See Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009). On one hand, Idaho Code sections 6-1012 and 6-1013 prescribe an expert's qualifications to offer testimony on the applicable standard of care and breach. *Id.* For an expert to be qualified to testify as to the standard of care and breach, that expert must have the proper foundation including that "such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed[.]" I.C. § 6-1013. The critical inquiry is whether the expert has actual knowledge of the community standard of care. *See Fisk v. McDonald*, 167 Idaho 870, 880–81, 477 P.3d 924, 934–35 (2020).

On the other hand, for issues of causation, expert testimony is "governed solely by the Idaho Rules of Evidence." *Coombs*, 148 Idaho at 140, 219 P.3d at 464. This expert testimony "is only admissible when 'the expert is a qualified expert in the field, the evidence will be of assistance to the trier of fact, [and] experts in the particular field would reasonably rely upon the same type of facts relied upon by the expert in forming his opinion[.]'" *Id.* (citing I.R.E. 702 and I.R.E. 703). To that end, "the foundation for the admission of opinion testimony based upon scientific knowledge includes both that the witness is an expert in the field and that there is a scientific basis for the expert's opinion." *Swallow v. Emergency Med. of Idaho, P.A.*, 138 Idaho 589, 593, 67 P.3d 68, 72 (2003). This means that courts must review both "the expert's

13

qualifications *and* the records relied upon by the expert to determine whether the expert can establish the necessary foundation." *Brauner v. AHC of Boise, LLC*, 166 Idaho 398, 406, 459 P.3d 1246, 1254 (2020); *see also Herrett v. St. Luke's Magic Valley Reg'l Med. Ctr., Ltd.*, 164 Idaho 129, 136, 426 P.3d 480, 487 (2018) (discussing the foundational requirements of Idaho Rule of Evidence 703).

Here, we conclude the district court abused its discretion in admitting the disputed testimony from Dr. Hancock because it did not act consistently with applicable legal standards. During trial, the Secols objected to any testimony from Dr. Hancock concerning Damian's six weeks of treatment at Fall River. The district court overruled these objections on multiple occasions. In overruling the Secols' objections, the district court first applied Idaho Rule of Evidence 702 and concluded that Dr. Hancock was well-qualified as an expert because he was an oncologist familiar with treating T-LBL. Next, the district court considered Idaho Rule of Evidence 703 and reasoned that the "proper reading of the rule" was to allow a qualified expert to give opinion testimony without first inquiring into the evidence they relied upon in arriving at their opinion. The district court noted the Secols could impeach Dr. Hancock's testimony by questioning the sufficiency and quality of the evidence he had reviewed. Thus, the district court misapplied Rule 703 because it did not apply it at all. As such, the district court failed to comply with the applicable legal standard that a court considering the admission of expert testimony must review both the expert's qualifications *and* the records relied upon. *See Brauner*, 166 Idaho at 406, 459 P.3d at 1254.

Having concluded that the district court did not act consistently with legal standards when deciding to admit Dr. Hancock's testimony, we turn to the content of that testimony to discuss why it lacked foundation under both Rule 702 and 703. The Secols characterize Dr. Hancock's testimony as concerning both breach and causation while Fall River argues that he only testified as to causation. We address breach and causation in sequence.

At trial Dr. Hancock testified that he thought it was standard or common for patients with T-LBL not to be referred to him until two to four months after their initial visit to a primary care provider. He also stated that it was common for patients to not have had a chest x-ray prior to their referral. Further, Dr. Hancock relayed a story about a prior T-LBL patient of his who went undiagnosed for four months with symptoms similar to Damian's. Yet, Dr. Hancock never expressly stated that he believed to a reasonable degree of medical certainty that Fall River did

14

not breach the applicable standard of care. However, like his responses to the district court's questioning, Dr. Hancock implied that Fall River acted appropriately by not conducting an x-ray of Damian's chest. This implication is belied by Dr. Hancock's own deposition testimony, in which he readily admitted that he was not a primary care provider nor familiar with when a primary care provider should conduct an x-ray. As a consequence, to the extent that Dr. Hancock's testimony was a backdoor into presenting evidence that Fall River did not breach the standard of care, it should have been excluded for lack of foundation.

As to causation, Dr. Hancock testified that he believes to a reasonable degree of medical certainty that a six-week delay in diagnosis of Damian's disease did not bring about his death. He based this opinion on his conclusion that Damian would have received the same treatment regardless of when he was referred to him. However, on cross-examination, Dr. Hancock testified that he had never reviewed Damian's medical records from his time at Fall River to assess his health when he received treatment there. Dr. Hancock did review Damian's records from EIRMC and LDSH, in addition to speaking with Damian and Cassie when Damian began his treatment with Dr. Hancock. Yet, the record does not reflect that Dr. Hancock relied on *any* evidence, let alone evidence that other experts would reasonably rely on, to form his opinion that the treatment Damian received at Fall River had no causal relationship with his death. As such, Dr. Hancock's testimony lacked the required foundation under Rule 703.

Based on the foregoing, we conclude the district court abused its discretion when it permitted Dr. Hancock to testify as to breach and causation without proper foundation. Accordingly, Dr. Hancock's testimony should have been limited to the boundaries of his expert witness disclosure.

On that front, Dr. Hancock's expert witness disclosure is as vague as it is sparse. That disclosure states:

> Dr. Hancock will testify consistent with his medical records and deposition testimony in this case. It is anticipated that Dr. Hancock may use some or all of the medical records pertaining to Damian Secol as exhibits in this case. He may also use illustrative exhibits to aid the jury with his testimony.[5]

---

[5] While the Secols have not challenged the sufficiency of this disclosure on appeal, it is doubtful that this disclosure complies with the mandate of Idaho Rule of Civil Procedure 26. That rule provides, in pertinent part, that non-retained expert disclosures must include "a statement of the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." I.R.C.P. 26(b)(4)(A)(ii). A bare statement that a non-retained expert will testify "consistent with his medical records and deposition testimony in this case" does not appear to satisfy either prong of this rule.

15

Dr. Hancock's deposition testimony, at least the portions made part of the record, parallels his trial testimony. That testimony also includes several overtures to the Secols' counsel that Dr. Hancock wished he could talk to Cassie to convince her Damian would not have been diagnosed earlier and that "no good would come of" this case. To the extent that much of Dr. Hancock's deposition testimony suffers from the same foundational issues as his trial testimony, it should be excluded on the same basis. However, Dr. Hancock has been properly disclosed, and has a proper foundation, to testify consistent with his medical records as to his observations of Damian during his treatment with Dr. Hancock. Accordingly, on remand, Dr. Hancock's testimony should be limited in this regard.

## C. Whether the district court abused its discretion in permitting Fall River two witnesses on the standard of care.

The Secols argue that the district court abused its discretion in granting Fall River's motion to reconsider and allowing Fall River to call two expert witnesses on the standard of care. The district court initially granted the Secols' motion in limine to limit Fall River to one expert on the standard of care based on Idaho Rule of Evidence 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." I.R.E. 403. However, following the assignment of a new district judge to the case, Fall River filed a motion to reconsider this motion in limine, which the district court granted. Yet, the district court's decision granting Fall River's motion for reconsideration has not been provided as part of the record on appeal.

"An appellant has the burden to provide a sufficient record to substantiate his claims on appeal." *Talbot v. Desert View Care Ctr.*, 156 Idaho 517, 520, 328 P.3d 497, 500 (2014) (citing *Goodman Oil Co. v. Scotty's Duro-Bilt Generator, Inc.*, 147 Idaho 56, 59, 205 P.3d 1192, 1195 (2009)). "When the appellant provides a record that is inadequate to review his claims, [this Court] will not presume error below." *Id.*

Here, the Secols have not provided the district court's decision on Fall River's motion for reconsideration as part of the record on appeal. Accordingly, we will not presume error in that decision.

16

**D. The district court erred in allowing Fall River to present irrelevant testimony from Dr. Gillette and Dr. Dustin concerning their families and hobbies.**

1. Standard of Review

The Idaho Rules of Evidence provide that "[r]elevant evidence is admissible unless these rules, or other rules applicable in the courts of this state, provide otherwise. Irrelevant evidence is not admissible." I.R.E. 402. Evidence is relevant if it is probative, having "any tendency to make a fact more or less probable" and material, being "of consequence in determining the action." I.R.E. 401. "Whether a fact is material is determined by its relationship to the legal theories presented by the parties." *State v. Johnson*, 148 Idaho 664, 671, 227 P.3d 918, 925 (2010) (quoting *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008)). "The question of whether evidence is relevant is reviewed de novo, while the decision to admit relevant evidence is reviewed for an abuse of discretion." *State v. Garcia*, 166 Idaho 661, 462 P.3d 1125, 1133 (2020).

2. Analysis

At trial, the district court permitted both Dr. Gillette and Dr. Dustin to introduce their families and speak about their hobbies.[6] In addition, both doctors' families were present in the courtroom as they were introduced one-by-one for the jury. The Secols argue that this was reversible error as the testimony was irrelevant and prejudicially appealed to the passions of the jury. Fall River, in contrast, contends that such information was relevant to witness credibility and, even if error did occur, such error was harmless. We conclude that the district court erred as a matter of law in admitting this highly irrelevant testimony. Given that the Secols are entitled to a new trial, we will not address the question of whether this evidence was harmless.

Near the end of his direct examination, counsel for Fall River asked Dr. Gillette to briefly introduce his family to the jury. Dr. Gillette introduced each of his four children by name, and described their year in school and interests. For example, he testified: "O. is my kindergartner, and O. is everybody's best friend" and "L. is a fourth grader . . . [i]f you ask him he will tell you that he is the best fisherman in our family." In addition, Dr. Gillette introduced his wife to the jury, describing her profession and stating, "[s]he's the only reason that I'm still here." Finally, Fall River's counsel asked Dr. Gillette what he liked to do and he responded, "I live outdoors."

---

[6] Although not objected to at trial, it is worth noting that Dr. Hancock was also permitted to testify as to irrelevant matters that only served to improperly curry favor with the jury. For instance, Dr. Hancock testified that his "father's partner's last name is on this courtroom" and that he "spent his summers working as a park ranger in Grand Teton National Park."

17

Dr. Dustin, at the beginning of his direct examination, testified similarly. Fall River's counsel asked Dr. Dustin to describe his family and he answered:

> I have four beautiful daughters, a senior at Madison High School, S., and a second daughter who is a freshman at Madison Junior high. Both of them run cross-country. I have a seventh grader, W.D., who is a basketball star in my opinion. And R.D. is a fifth-grader at Madison Middle School.
> And then I am married to the most beautiful woman in the world, in my opinion.

The Secols objected to both Dr. Gillette and Dr. Dustin's testimony regarding their families and hobbies. The district court overruled both objections without explaining its reasoning. Arguing against the Secols' objection to Dr. Gillette's testimony, Fall River's counsel gave the following justification for asking him about his family and hobbies in front of the jury: "they're judging him. I think that they're entitled to know – we got to hear a lot about Ms. Secol. I think the jury is entitled to know a little about his background and family." Further, Fall River's counsel also stated that "it's important for [the jury] to know who you are. Your family is part of this, so tell the jury about them briefly." Fall River's counsel did not make a similar argument with respect to Dr. Dustin's testimony and only noted that the district court had authorized a limited amount of questions about Dr. Dustin's family and hobbies. On appeal, Fall River provides an additional justification and relies on *State v. Owen*, 73 Idaho 394, 253 P.2d 203 (1953), for the proposition that "it is the general practice, at least in important criminal trials, to permit any witness to testify briefly and generally as to his background, giving such facts as date and place of birth, family relationship and occupation, to better enable the jury to appraise the general character of the witness." 73 Idaho at 404, 253 P.2d at 208.

Before addressing Fall River's argument on appeal, we briefly note that the justifications offered for the family and hobby testimony at trial are immaterial. Information about Damian's family, including Cassie and her children is certainly relevant to the question of damages in the case and entirely appropriate. However, testimony from Dr. Gillette and Dr. Dustin in that regard has no bearing on any legal issue in the case. What is more, Fall River's argument at trial only underscores that the testimony was not useful for the jury to assess witness credibility, but only served to ingratiate the doctors with the jury and appeal to their sympathies rather than their reason.

Turning to Fall River's argument on appeal, *Owen* is distinguishable from the case at hand in several key respects. First, the decision in *Owen* predates the adoption of Idaho Rules of

Evidence in 1985. Pertinent here, those rules prohibit the use of character evidence to show that a person acted in conformity with a particular character trait. I.R.E. 404. Next, the Court in *Owen* was considering whether a trial court erred in refusing to allow criminal defendants to testify as to their backgrounds and family as mitigating circumstances in a death penalty case. *Owen*, 73 Idaho at 403–04, 253 P.2d at 207–08. In contrast, this is a civil case that does not require the jury to consider mitigating circumstances in choosing a punishment, nor does it implicate a criminal defendant's right to offer evidence of his character for a pertinent trait. *See* I.R.E. 404(a)(2).

Having concluded that *Owen* is inapplicable to this case, we consider if the family and hobby testimony had any other permissible purpose. Idaho Rule of Evidence 608 permits a witness's credibility to be attacked or supported by reputation or opinion evidence of the witness's character for truthfulness or untruthfulness. I.R.E. 608(a). However, evidence of a truthful character is "admissible only after the witness's character for truthfulness has been attacked." *Id.*

In this case, the district court erred in admitting testimony from the defendants concerning their families and hobbies because that testimony was manifestly irrelevant. It had no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. First, assuming the testimony was offered with respect to the material question of a witness's character for truthfulness, it was not probative on that subject. Whether a witness has a family or enjoys recreating outdoors has no tendency to make their truthful nature any more or less probable. Next, even if the testimony was material and probative, a witness's character for truthfulness may only be proved on direct examination by reputation or opinion evidence, not specific acts. I.R.E. 608(b). So, the specific facts of the doctors' families and hobbies would not be admissible even if relevant unless offered on cross-examination. Finally, evidence of a good character for truthfulness is only admissible after a witness's character has been attacked. I.R.E. 608(a). Here, both Dr. Gillette and Dr. Austin were permitted to testify as to their families and hobbies on direct examination before their credibility had been attacked. In sum, the Idaho Rules of Evidence provided no basis for the admission of Dr. Gillette's and Dr. Dustin's testimony concerning their families and hobbies. "Irrelevant evidence is not admissible." I.R.E. 402. The district court erred in failing to exclude it.

19

Since the district court made a legal error in deeming this evidence admissible, we have no need to further analyze whether the admission of such testimony was harmless. The evidence is inadmissible as a matter of law in any future trial upon remand.

**E. The district court erred in deviating from the standard jury instruction for medical malpractice.**

   1. Standard of Review

Whether a jury instruction is correct "is a question of law over which this Court exercises free review, and the standard of review of whether a jury instruction should or should not have been given, is whether there is evidence at trial to support the instruction." *Smith v. Mitton*, 140 Idaho 893, 899, 104 P.3d 367, 373 (2004) (quoting *Clark v. Klein*, 137 Idaho 154, 156, 45 P.3d 810, 812 (2002)). "The standard of review for issues concerning jury instructions is limited to a determination of whether the instructions, as a whole, fairly and adequately present the issues and state the law. When the instructions, taken as a whole, do not mislead or prejudice a party, an erroneous instruction does not constitute reversible error." *Id.* (quoting *Silver Creek Computs., Inc. v. Petra, Inc.*, 136 Idaho 879, 882, 42 P.3d 672, 675 (2002)). Instructions that correctly state the law may still be reversed on appeal if they are "so confusing and argumentative as to mislead the jury." *See State v. Merwin*, 131 Idaho 642, 647, 962 P.2d 1026, 1031 (1998) (quoting *State v. Rhoades*, 121 Idaho 63, 82, 822 P.2d 960, 979 (1991)).

   2. Analysis

The Secols assign as error the district court's delivery of a jury instruction on medical malpractice that differed from the standard instruction in the Idaho Civil Jury Instructions ("IDJI"). Fall River responds by arguing that the district court's instruction accurately stated the law and was not delivered in error. We conclude that the jury instruction, while arguably an accurate statement of law, was so confusing as to mislead the jury and require reversal.

We have previously cautioned "that any court which varies from jury instructions previously approved by this Court does so at considerable risk that the verdict rendered will be overturned on appeal." *Merwin*, 131 Idaho at 647, 962 P.2d at 1031. However, the standard jury instructions are not mandatory, and a district court may depart from an applicable standard instruction on the condition that it "finds that a different instruction would more adequately, accurately, or clearly state the law." *Vendelin v. Costco Wholesale Corp.*, 140 Idaho 416, 433, 95 P.3d 34, 51 (2004) (quoting I.R.C.P. 51(a)(2), now I.R.C.P. 51(g)).

The IDJI instruction for medical negligence reads, in relevant part, that:

20

On the claim of medical negligence against the defendant for failure to meet the standard of care, the plaintiff has the burden of proof on each of the following propositions:

1. That the defendant failed to meet the applicable standard of care as defined in these instructions;

. . . .

3. That the acts of the defendant which failed to meet the applicable standard of care were a proximate cause of the injuries of the plaintiff

I.D.J.I. 2.10.3.

In contrast, the district court delivered an instruction derived from the standard instruction, but containing two significant alterations. That instruction read:

On the claim of medical negligence against the Defendants for failure to meet the standard of care, the Plaintiff has the burden of proof on each of the following propositions:

1. *By direct expert testimony* that the Defendants failed to meet the applicable standard of care as defined in these instructions;

. . . .

3. *By expert testimony, considering the evidence in the case*, that the acts of the Defendants, *in failing to meet the applicable standard of care*, were a proximate cause of Mr. Secol's premature death . . . .

Regarding this instruction, the Secols argue that it misleads the jury by shrinking the world of relevant evidence it could consider in determining whether the defendants breached the applicable standard of care. For example, the Secols assert that the jury may have thought it could not consider any evidence of breach—such as medical literature, Damian's medical records and treatment at EIRMC, or lay witness testimony—outside of that given by direct expert testimony.

Fall River responds by arguing that the instruction is entirely consistent with the requirement of Idaho Code section 6-1012 that the plaintiff must prove the applicable standard of care and breach of that standard by direct expert testimony. In essence, Fall River argues that to the extent a jury may consider evidence such as medical literature, medical records, and lay witness testimony, such evidence must first be offered as part of direct expert testimony concerning the standard of care and breach.

Fall River correctly points out that Idaho Code requires a plaintiff in a medical malpractice action to establish the standard of care and breach of that standard by expert

21

testimony. *See* I.C. 6-1013. In addition, Idaho Code section 6-1012 provides that a plaintiff in a medical malpractice case "must, as an essential part of his or her case in chief, affirmatively prove *by direct expert testimony* and by a preponderance of all the competent evidence" that the defendant medical provider negligently breached the applicable standard of care. I.C. § 6-1012 (emphasis added).

As to causation, "nothing in Idaho Code sections 6-1012 or 6-1013 requires that proximate cause be proved by expert testimony[.]" *Coombs v. Curnow*, 148 Idaho 129, 140, 219 P.3d 453, 464 (2009). Expert testimony, however, "is generally required because 'the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury.'" *Id.* (quoting *Flowerdew v. Warner*, 90 Idaho 164, 170, 409 P.2d 110, 113 (1965)).

In this case, we need not address the precise scope of breach and causation evidence under Idaho Code sections 6-1012 or 6-1013 because we conclude that the district court's instruction was so confusing on that subject as to require reversal. The juxtaposition of the phrase "by direct expert testimony" in one element of the instruction, with "by expert testimony" in another, is not a more adequate or clear statement of the law than IDJI 2.10.3. Indeed, counsel for Fall River, when asked by this Court at oral argument, could not discern a meaningful difference between those two phrases that would be within the grasp of an average juror. When the honing steel of appellate litigation, wielded by competent counsel, cannot produce an explanation sharp enough to cut through the confusion of an instruction, we cannot conclude that the instruction "fairly and adequately" presented the law. Nor can we conclude that such an instruction is a clearer or more accurate statement of the law than that set forth in the standard instruction. Accordingly, we conclude the district court erred in delivering the modified instruction because it confused and mislead the jury as to the evidence it could consider, prejudicing the Secols.

## F. The punitive damages issue is moot.

"It is well-established that this Court does not decide moot cases." *Comm. for Rational Predator Mgmt. v. Dep't of Agric, State of Idaho*, 129 Idaho 670, 672, 931 P.2d 1188, 1190 (1997). This Court has held that "an issue is moot if it presents no justiciable controversy and a judicial determination will have no practical effect upon the outcome." *Idaho Schs. For Equal Educ. Opportunity v. Idaho State Bd. of Educ.*, 128 Idaho 276, 281, 912 P.2d 644, 649 (1996) (citation and quotation omitted). The mootness doctrine applies when "a favorable judicial

22

decision would not result in any relief." *Fenn v. Noah*, 142 Idaho 775, 779, 133 P.3d 1240, 1244 (2006).

The Secols contend that the district court erred in not instructing the jury on punitive damages because the evidence adduced at trial was sufficient to justify such an instruction. Fall River counters by arguing that the Secols did not present any evidence on the state of mind necessary for punitive damages, so the district court did not err in taking this question from the jury. Perplexingly, although neither party alludes to it in their briefing, the reason the question of punitive damages did not reach the jury is because the district court granted Fall River's motion for a directed verdict on the Secols' claim of punitive damages.

Given that this Court has concluded a new trial is necessary in this matter, the issue of whether the district court erred in granting a directed verdict on punitive damages (or in failing to instruct the jury on the same) is now moot. What evidence may be presented at a new trial, and how the district court may apply the law to that evidence, is unaffected by any decision this Court could deliver on appeal. Accordingly, a holding that the district court erred in granting a directed verdict on the Secols' punitive damages claim would have no practical effect on the outcome of the litigation. Instead, the question of whether the Secols can successfully maintain a claim for punitive damages against Fall River is properly reserved for the new proceedings below.

## G. Attorney's Fees on Appeal.

Both the Secols and Fall River have requested attorney's fees on appeal pursuant to Idaho Code section 12-121. Although the Secols are the prevailing party on appeal, we decline to award attorney's fees pursuant to section 12-121. Notwithstanding the multiple serious legal errors at trial, we are not left with the abiding belief that Fall River's defense of this appeal was frivolous. *See, e.g.*, *Chavez v. Barrus*, 146 Idaho 212, 225, 192 P.3d 1036, 1049 (2008) ("An award of attorney's fees under I.C. § 12-121 is proper only where the Court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation.") (citation and quotations omitted). As such, we award no attorney's fees on appeal.

## IV.    CONCLUSION

The district court abused its discretion in denying the Secols' motion for a new trial because its questioning of Dr. Hancock denied the Secols a fair trial. Such questioning was an abuse of discretion and necessitates a new trial.

The district court also abused its discretion in permitting Dr. Hancock to testify as to matters for which no foundation was laid and which were outside the scope of his expertise. Dr. Hancock should have been restricted to testifying within the boundaries of his knowledge as Damian's treating oncologist.

In addition, the district court erred in admitting irrelevant testimony about Dr. Gillette's and Dr. Dustin's families and hobbies. That testimony was irrelevant to any claim or defense and served only to improperly appeal to the sympathies of the jury.

The district court erred in delivering a modified jury instruction on medical negligence, which included prejudicially confusing language concerning direct expert testimony as compared to expert testimony.

The punitive damages issue is moot. Any determination this Court may reach on the issue would not have a practical effect on the outcome below. Rather, whether the Secols have carried their burden to present the jury with a punitive damages instruction is to be decided by the district court during a new trial.

Finally, we cannot conclude that the district court erred in permitting Fall River two experts on the standard of care because its decision on Fall River's motion for reconsideration is not part of the record. Accordingly, we affirm the district court's decision in that respect.

Based on the above, the matter is remanded for a new trial consistent with this opinion. On remand, a new district judge shall be assigned to preside over the trial. No attorney's fees are awarded on appeal, but we award costs to the Secols.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and Justice Pro Tem SCHROEDER **CONCUR.**

24